IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 23-3256

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

JAMOND M. RUSH,

Defendant - Appellant

On Appeal from the
United States District Court for
the Southern District of Illinois
Case No. 4:22-cr-40008-JPG-1
The Honorable Judge J. Phil Gilbert

**BRIEF OF THE APPELLANT JAMOND M. RUSH**

**NEWTON BARTH, L.L.P.**

By:   s/ Talmage E. Newton IV
      Talmage E. Newton IV, ARDC6305302
      555 Washington Ave., Ste. 420
      St. Louis, Missouri 63101
      Telephone:  (314) 272-4490
      Facsimile:   (314) 762-6710
      talmage@newtonbarth.com

      ***ATTORNEY FOR APPELLANT***
      ***JAMOND M. RUSH***

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-3256

Short Caption: United States of America v. Jamond M. Rush

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

         [ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Jamond M. Rush

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Talmage E. Newton, IV, Newton Barth, LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Talmage E. Newton, IV      Date: 2/2/2024

Attorney's Printed Name: Talmage E. Newton, IV

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]   **No** [ ]

Address: 555 Washington Avenue, Suite 420

         St. Louis, MO 63101

Phone Number: 314-272-4490      Fax Number: 314-762-6710

E-Mail Address: talmage@newtonbarth.com

rev. 12/19 AK

# TABLE OF CONTENTS

Page(s)

DISCLOSURE STATEMENT …………………………………………………... 2

TABLE OF AUTHORITIES ……………………………………………….. 5

JURISDICTIONAL STATEMENT …………………………………………...10

STATEMENT OF THE ISSUE ………………………………………………..11

STATEMENT OF THE CASE ………………………………………………..12

SUMMARY OF ARGUMENT ………………………………………………14

ARGUMENT ………………………………………………………………….15

I.   The plain text of The National Firearms Act, 26 U.S.C. §5861(d), categorically burdens Appellant's rights under the Second Amendment…19

     a.   Appellant Rush is one of "the people" protected by the Second Amendment…………………………………………………………19

     b.   The Second Amendment's Protection extends to all "bearable arms," including that which Mr. Rush is charged with possessing……………21

II.   There is no historical tradition of regulating the conduct prohibited by 26 U.S.C. §5861(d)……………………………………………………………24

     a.   Short-barreled arms were common during the founding era and remain common today…………………………………………………… 29

     b.   Discriminately regulating short-barreled rifles burdens rights protected by the Second Amendment and has no historical basis……………………33

     c.   *United States v. Miller* Does not require a different result………………34

     d.   The Government has failed to show that 26 U.S.C. § 5861(d) is consistent with the Nation's historical tradition of firearm regulation……………36

CONCLUSION ………………………………………………………....38

CERTIFICATE OF COMPLIANCE ………………………………………40

REQUIRED SHORT APPENDIX………..……………………………………...41

CERTIFICATE OF COMPLIANCE WITH CIR. R. 30 ………………………...42

PROOF OF SERVICE …………………………………………………...43

APPENDIX ……………………………………………………...… 44

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023)......................................... 17, 18

*Bevis v. City of Naperville, Illinois,* 85 F.4th 1175 (7th Cir. 2023)............ 22, 23, 24

*Crawford v. Marion C'nty. Election Bd*., 553 U.S. 181 (2008) .........................33

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... passim

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) ......................................38

*Edwards v. Prime, Inc*., 602 F.3d 1276 (11th Cir. 2010) .......................................36

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)................ 33, 34, 35

*Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575

   (1983) ........................................................................................................33

*Sonzinsky v. United States*, 300 U.S. 506 (1937).........................................16

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) .........................................................23

United States Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct.

   211 (2022) ................................................................................................ passim

*United States v. Coscia*, 866 F.3d 78 (7th Cir. 2017)...............................................12

*United States v. Lim*, 444 F.3d 910 (7th Cir. 2006)................................................16

*United States v. Miller,* 307 U.S. 174 (1939) ............................................ 34, 35, 36

*United States v. Sarraj*, 665 F.3d 916 (7th Cir. 2012)...........................................15

*United States v. Taylor*, 2024 WL 24557, 5 (S.D. Il 2024)....................................21

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ......................................19

*United States v. White*, 610 F.3d 956 (7th Cir.2010)................................................15

## STATUTES

18 U.S.C. §922 ........................................................................................ passim

18 U.S.C. §923 ......................................................................................................36

18 U.S.C. §1291 ....................................................................................................10

26 U.S.C. §5801 ....................................................................................................29

26 U.S.C §5841 .....................................................................................................12

26 U.S.C. §5845 ....................................................................................................12

26 U.S.C. §5849 .................................................................................... passim

26 U.S.C. §5861 .................................................................................... passim

26 U.S.C. §5871 ....................................................................................................12

28 U.S.C. §41 ........................................................................................................10

## OTHER AUTHORITIES

Blackstone, William, 1723-1780 Commentaries on the Laws of England. Boston:

   Beacon Press, 1962 ............................................................................22

Buckman, Elliott *Just a Soul Whose Intentions Are Good? The Relevance of A*

   *Defendant's Subjective Intent in Defining A "Destructive Device" Under the*

   *National Firearms Act,* 79 Fordham L. Rev. 563 (2010) ....................................16

Bureau Alcohol, Tobacco, Firearms, and Explosives, Firearms Commerce in the

    United States: Annual Statistical Update 2021, at 16 (2021) ...............................31

Cooper, Forrest, *SBR: The Arbitrary Infringement on a Short Barreled Rifle*,

    Recoil (August 20, 2021) ......................................................................................32

D'Cruz, James A. *Half-Cocked" The Regulatory Framework of Short-Barrel*

    *Firearms*, 40 Harv. J.L. & Pub. Pol'y 493 (2017)........................................ passim

Frye, Brian L., *The Peculiar Story of United States v. Miller*, 3 N.Y.U. J. of L. &

    Liberty, 48 (2008) .................................................................................................35

Halbrook, Stephen P., Firearms Law Deskbook § 8:10 (2021) ...............................32

Press Release, DOJ, Justice Department Issues Proposed Rule and Model

    Legislation to Reduce Gun Violence (June 7, 2021).............................................29

Press Release, U.S. Representative Tracey Mann, *Representative Tracey Mann*

    *Introduces the Home Defense and Competitive Shooting Act* (March 17,

    2021) ......................................................................................................................32

Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By Wheeler*

    *(about 1795)* ..........................................................................................................30

Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By James*

    *Barbar* (dated 1755)..............................................................................................30

Royal Armouries Collections, *Flintlock muzzle-loading carbine – Short Light*

    *Cavalry Carbine (Experimental Paget Carbine) (About 1805)*, ..........................30

Snow, John B., *The Ultimate Truck Gun Build (Plus 14 More Guns for Your Pickup)* ...................................................................................... 31, 32

The American Revolution Institute, *Blunderbuss, the "Thunder Box" of the Battlefield,* ...................................................................................31

Todd, Frederick P., American Military Equipage 1851-1872, 134 (1980) .............31

Zimring, Franklin E., *Firearms and Federal Law; The Gun Control Act of 1968*, 4 J. Legal Stud. 133 (1975)...................................................................16

## RULES

Cir. R. 30 ...........................................................................................42

Fed. R. App. P. 32 ...........................................................................40

Fed. R.Crim. P. 11 ......................................................................... 10, 13

Fed. R. Crim. P. 12 ...........................................................................12

## REGULATIONS

86 FR 30826 ........................................................................................32

86 FR 30827 ........................................................................................32

86 FR 30828 ........................................................................................32

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. 1................................................................................19

U.S. Const. amend. 2..................................................................... passim

U.S. Const. amend. 4.....................................................................19

U.S. Const. amend. 9.....................................................................19

U.S. Const. amend. 10 ...................................................................19

U.S. Const. amend. 14 .............................................................. 16, 26

## JURISDICTIONAL STATEMENT

The United States invoked the district court's jurisdiction under 26 U.S.C. §5861(d) (receipt or possession of an unregistered firearm). (DCD_18). After challenging the facial constitutionality of the statute before the district court (and losing) Appellant pleaded guilty to that charge, maintaining his right to appeal the issue presented herein pursuant to Federal Rule of Criminal Procedure 11(a)(2). (DCD_52). On November 21, 2023, the district court sentenced the Appellant to a total term of imprisonment of 30-months. (DCD_63). The same day as the judgment was entered, a timely notice of appeal was filed with the district court. (DCD_71). Both the judgment and sentence were imposed by the Honorable J. Phil Gilbert, District Judge of the United States District Court for the Southern District of Illinois, in Benton, Illinois. (DCD_69, 70). Appellant directly appeals from the final judgment, invoking this Court's jurisdiction under 18 U.S.C. § 1291. The United States Court of Appeals for the Seventh Circuit has the authority to review this appeal because the United States District Court for the Southern District of Illinois is located within its jurisdiction. 28 U.S.C. §41.

## **STATEMENT OF THE ISSUE**

26 U.S.C. §5861(d) (receipt or possession of an unregistered firearm) unconstitutionally burdens core conduct protected by the Second Amendment to the United States Constitution The indictment and conviction violate Appellant's Second Amendment rights considering the holding of the United States Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 211 (2022).

The district court erred in finding that Appellant's conduct (possession of the firearm) was not protected by the plain text or the historical understanding of the Second Amendment.

## STATEMENT OF THE CASE

On August 16, 2022, Appellant was charged by superseding indictment with a single count of possessing an unregistered firearm in violation of 26 U.S.C. §5861(d) (DCD_18). Specifically, the Government charged that the Appellant, "knowingly received or possessed a firearm as defined in Title 26, United States Code, Section 5845(a)(3), being an Anderson Manufacturing AR-15 rifle…having a barrel of less than 16 inches, which was not registered to him in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Code, Section 5841, 5861(d), and 5871." (DCD_18).

Appellant filed a motion to dismiss the superseding indictment challenging the constitutionality of the charging statute pursuant to the United States Supreme Court holding in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 211 (2022). (DCD_28).[1] The Government responded in writing opposing dismissal and supporting the constitutionality of the statute. (DCD_38). A reply brief was filed by the Appellant (DCD_43). The district court did not take oral arguments on the

---

[1] A party may raise by pre-trial motion any defense, objection, or request that the court can determine without a trial on the merits. Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds. See *United States v. Coscia*, 866 F.3d 782, 790 (7th Cir. 2017) (considering defendant's contention that the indictment must be dismissed because the statute under which it is brought is unconstitutionally vague.)

matter.[2] On January 25, 2023, the district court issued a written order denying Appellant's motion to dismiss. (DCD_46).

On May 4, 2023, pursuant to Federal Rule of Criminal Procedure 11(a)(2), the Appellant entered a conditional plea of guilty to this charge. (DCD_52). The Appellant's plea preserved his right to challenge the District Court's denial of his motion to dismiss. (see Plea Agreement @ DCD_52, §V(6)(d)).

Judgment was ultimately entered against the Appellant, he was convicted of a felony, and he was sentenced to 30-months incarceration in the U.S. Bureau of Prisons. (DCD_69). A timely notice of appeal was filed the same day Judgment was entered. (DCD_71). This appeal follows.

---

[2] As the district court relied on the written record and did not take oral arguments on the matter, no transcript is submitted as part of this appeal.

## SUMMARY OF THE ARGUMENT

26 U.S.C. §5861(d) (receipt or possession of an unregistered firearm) unconstitutionally burdens core conduct protected by the Second Amendment to the United States Constitution. The indictment and conviction violate Appellant's Second Amendment rights considering the holding of the United States Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 211 (2022).

# **ARGUMENT**

Title 26 U.S.C. §5861(d) (receipt or possession of an unregistered firearm) is facially unconstitutional considering the holding of the United States Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 211 (2022).

## **Standard of Review**

Appellant's motion to dismiss raised purely legal questions for review by the district court. The Court of Appeals will review questions of law in a district court's ruling on a motion to dismiss an indictment de novo. *United States v. White*, 610 F.3d 956, 958 (7th Cir.2010); *United States v. Sarraj*, 665 F.3d 916, 920 (7th Cir. 2012).

## **Discussion**

The superseding indictment charged a sole count of possessing an unregistered, short-barreled rifle in violation of 26 U.S.C. §5861(d). This statute imposes criminal penalties on anyone who possesses a short-barreled rifle without complying with the National Firearms Act's taxation and registration requirements. This statute burdens core conduct covered by the Second Amendment of the United States Constitution, which directs, "[a] well-regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms" both in the home[3] and in public[4] "shall not be infringed."

The National Firearms Act, 26 U.S.C. §5861(d), was first enacted in 1934 and imposes stiff criminal penalties on anyone who receives or possesses a short-barreled rifle that is not registered in the National Firearms Registration and Transfer Records.[5] The first version of the statue was upheld as a valid exercise of Congress's authority to tax. *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937) ("since it operates as a tax, it is within the national taxing power"); *see also United States v. Lim*, 444 F.3d 910, 913 (7th Cir. 2006). Despite purporting to regulate firearms associated with criminal activity,[6] the Act covers arms that are in common use.[7] And,

---

[3] *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.").

[4] *Bruen,* 142 S. Ct. at 2122. (The "Second and Fourteenth Amendments protect and individual's right to carry a handgun for self-defense outside the home.").

[5] National Firearms Act of 1934, Pub L. No. 730474, 48 State. 1236-1240.

[6] The National Firearms Act regulated arms "that had gained reputations as gangster weapons" and has been characterized as "a symbolic denunciation of firearms in the hands of criminals." Elliott Buckman, *Just a Soul Whose Intentions Are Good? The Relevance of A Defendant's Subjective Intent in Defining A "Destructive Device" Under the National Firearms Act,* 79 Fordham L. Rev. 563, 570-571 (2010) (quoting Franklin E. Zimring, *Firearms and Federal Law; The Gun Control Act of 1968*, 4 J. Legal Stud. 133, 143 (1975)).

[7] Over half-a-million short-barreled rifles are currently registered with the federal government. Bureau Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, at 16 (2021) (listing total short-barreled rifles registered at 532, 725 as of May 2021).

the Act imposes these heightened restrictions and penalties on short-barreled rifles, even though they "have no discernable operational differences from firearms excluded from the Act," such as pistols and other handguns.[8]

In 2022, the Supreme Court decided *Bruen*, interpreting the Second Amendment and striking down a New York law which required residents to demonstrate good cause to obtain a license to carry a handgun outside the home. Finding that *certain* firearm regulations remain constitutional, the Court provided an analytical framework for determining whether a particular firearm regulation violates the Second Amendment: Courts must first determine whether the "Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129–30; see also *Atkinson v. Garland*, 70 F.4th 1018, 120 (7th Cir. 2023). If so, the Constitution presumptively protects that conduct, and the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2126. If the government cannot meet this burden, then the individual's firearm-related conduct falls within the Second Amendment's "unqualified command" and is protected. *Id*.

---

[8] James A. D'Cruz, *Half-Cocked" The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 496 (2017). This is to say nothing about what the practical difference is between an AR-15 with a barrel longer than 16-inches versus one with a barrel less than 16-inches, which seems rather arbitrary.

The Supreme Court in *Bruen* overturned existing law in every circuit and held that the rights guaranteed by the Second Amendment are not subject to any interest balancing or means-ending scrutiny, explaining, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2125-26. To then justify regulating protected conduct, "the government may not simply posit that the regulation promotes an important interest." *Id.* at 2126; see also *Atkinson*, 70 F.4th at 1019. "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition the delimits the outer bounds of the right to keep and bear arms." *Id. at 2127; Atkinson*, 70 F.4th at 1020.

As highlighted above, 26 U.S.C. §5861(d) is a twentieth century innovation that burdens constitutionally protected conduct. Regulations did not exist during the founding era that taxed or registered short-barreled arms. And, as discussed further below, such regulations have no historical analogue. The government therefore cannot meet its burden to prove these regulations are consistent with the Nation's historical tradition of firearms regulation. The indictment should have been dismissed by the district court as violative of the Second Amendment.

I.     **The plain text of The National Firearms Act, 26 U.S.C. §5861(d), categorically burdens Appellant's rights under the Second Amendment.**

To determine whether a government regulation implicates the Second Amendment, *Bruen* asks whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. The answer to that question is not difficult in this case. The Second Amendment protects the right of "the people" to "keep and bear arms."

a.  **Appellant Rush is one of "the people" protected by the Second Amendment.**

Appellant Mr. Rush is clearly included within the definition of "the people" protected by the Second Amendment. When the Constitution uses "the people," it means citizens and members of the political community. *Heller*, 554 U.S. at 580-81. The Second Amendment, along with the First, Second, Fourth, Ninth, and Tenth Amendments, refers to "the people." Within the Constitution, "the people" is a "term of art," and wherever it occurs, "the term unambiguously refers to all members of the political community, *not an unspecified subset*." *Id.* (emphasis added); accord *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (The term "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."). The Second Amendment right—no less than the others mentioned above—"belongs to all Americans." *Id.* at 581.

The Government has previously suggested that the Second Amendment's protections extend only to "law abiding, responsible citizens." *Heller* and *Bruen* did not so constrain the scope of the term "the people." See *Heller*, 554 U.S. at 580–81 (discussing meaning of "the people"). In context, the *Heller* Court said elsewhere in its opinion only that, "*whatever else [the Second Amendment] leaves to future evaluation*, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635 (emphasis added). Nor did *Bruen* address the full scope of the term "the people," because it was "undisputed" in that case that the petitioners were "part of 'the people'" as "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134 (citing *Heller*, 554 U.S. at 580). Fundamentally, "[n]othing in the Second Amendment's text draws [that] distinction with respect to the right to keep and bear arms." *See Id*.

With respect to the "law abiding" and "responsible citizen" language, it is also worth noting that Appellant Mr. Rush was not a prohibited person prior to the judgment in this case (as contemplated by statutes such as 18 U.S.C. §922, et seq.). (See P.S.R. at DCD_63, Part B. ¶¶36-47). Other than the charged failure to comply with provisions of The National Firearms Act, 26 U.S.C. §5861(d), Appellant had no legal prohibitions barring his ownership of a firearm prior to this case. It was in fact his possession of this specific gun, in violation of The National Firearms Act, 26 U.S.C. §5861(d), which has made him a felon (for the rest of his life) and which

now places him within the purview of 18 U.S.C. §922 (to the extent that statutory framework survives *Bruen*.) See *United States v. Taylor*, 2024 WL 24557 at *5 (S.D. Il 2024) (finding that §922(g)(1) led to a permanent prohibition on firearm possession by felons and holding that "[b]y imposing lifetime dispossession and criminalization, §922(g)(1) clearly imposes a significantly greater burden on a convicted felon's right to keep and bear arms").

**b. The Second Amendment's Protection extends to all "bearable arms," including that which Mr. Rush is charged with possessing.**

The Appellant contends that the conduct proscribed by 26 U.S.C. §5861(d), possession of a firearm, easily qualifies as "keep[ing]" and "bear[ing]" arms. *See Heller*, 554 U.S. at 628-629 (holding statute that barred possession of handguns in the home unconstitutional.) And 26 U.S.C. §5861(d) applies to everyone, necessarily impacting "the right of the people."

According to *Heller*, "the Second Amendment extends, prima facie, to all instruments that constitute *bearable arms*, even those that were not in existence at the time of the founding." 554 U.S. at 582 (emphasis added). An instrument need not have existed at the time of the founding to fall within the amendment's protection, but it must fit the founding-era definition of an "Arm[ ]." *Id.* (citing two dictionaries from the eighteenth century, and one from the nineteenth century). Then and now, that means, the Second Amendment covers "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his

21

hands, or useth in wrath to cast at or strike another." *Id.* At 581 (alteration in original) (citations omitted).

It has been the Government's contention that a short-barreled rifle is "dangerous and unusual" and therefore falls outside the scope of the Second Amendment and this entire analysis can be terminated upon this determination. *Heller* itself however stated that the relevance of a weapon's dangerous and unusual character lies in the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id*. at 627 (emphasis added) (cleaned up). It did not say that dangerous and unusual weapons are not arms. Thus, whether a short-barreled rifle is "dangerous and unusual" is a contention as to which the Government should bear the burden of proof in the second prong of the *Bruen* analysis.[9]

Appellant's position that the nature of the firearm is a proper subject of the "second prong" of a *Bruen* examination position appears at odds with the majority opinion of a panel of this Court in *Bevis v. City of Naperville, Illinois* which found that "bearable Arms" extends only to weapons in common use for a lawful purpose, which did "not include weapons that may be reserved for military use." 85 F.4th

---

[9] It is worth noting that the language "dangerous or unusual weapons" appears to come from Blackstone and reads, "The offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace…" 4 Blackstone 148-49 (1769). Even according to Blackstone, it was not illegal to possess "dangerous or unusual weapons." Instead "riding or going armed" with those weapons was the crime. Nothing prohibited the mere possession or transfer of dangerous weapons or the use of them to defend the house.

1175, 1193 (7th Cir. 2023). The *Bevis* Court stated that it was at least preliminarily "satisfied that these appeals can be resolved at the first step of the *Bruen* framework." *Id.* at 1197. While it did not conclusive determine that an AR-15 was NOT an Arm within the purview of the Second Amendment, it cast a very skeptical gaze on weapons such as the AR-15 and seriously questioned whether such a firearm fell within the protections of the Second Amendment to even passed the first step of the *Bruen* analysis. *Bevis*, 85 F.4th 1192-1197. Other Circuits have come to different conclusions, with a panel in the Ninth Circuit holding that, "[w]hether [a type of arms] are 'dangerous and unusual' is a contention as to which [the government] bears the burden of proof in the second prong of the *Bruen* analysis. *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023).

It remains the Appellant's contention that *Bruen* calls into question any such limitations on the definition of Arm (especially at the first prong of the analysis) and that a firearm such as that charged in the superseding indictment in this case *is* an Arm subject to the protections of the Second Amendment.  Either way, the Government must bear the burden of proving that the gun in question is "dangerous and unusual" and failed to do so in this case, resting instead on pre-*Bruen* cases.

*Bruen*'s first step requires only that the Second Amendment's plain text cover the "conduct." The prohibited conduct under §5861(d) is "possession of a firearm"— nothing more. "*Bruen*'s first step asks a strictly textual question with only one

answer: the Second Amendment's plain text covers possession of a firearm. Because the Second Amendment's plain text covers the conduct at issue in 26 U.S.C. §5861(d), the Constitution presumptively protects that conduct.

## II.    There is no historical tradition of regulating the conduct prohibited by 26 U.S.C. §5861(d).

Because the Constitution presumptively protects possessing a firearm, §5861's constitutionality hinges on whether regulations prohibiting a person from possessing or transferring a firearm that isn't registered in the National Firearms Registration and Transfer Record align with the Nation's historical tradition of firearm regulation.

From the outset it should be noted that a 7th Circuit panel in *Bevis v. City of Naperville, Illinois,* concluded, at the preliminary injunction stage on an *interlocutory* appeal, that the plaintiffs in that case had not shown a likelihood of success in proving that laws regulating weapons such as the AR-15 were not consistent with the history and tradition of firearms regulation in the United States. *Bevis* 85 F.4th 1175 at 1198.[10] Appellant disagrees with this preliminary assessment.

In *Heller*, the Supreme Court's landmark case establishing and individual right to keep arms, the Court remarked that nothing in its "opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."

---

[10] Circuit Judge Wood engaged in a lengthy analysis of the majority's view of the historical tradition in Bevis, found at 85 F.4th 1197 to 1203.

*Heller, 554 U.S. at 626.* The Supreme Court's decision in *Bruen* however demands a fresh look at the National Firearms Act through the lens of the Second Amendment's text, history, and tradition. The *Bruen* decision could not be clearer: "the government must **affirmatively prove** that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127. It is no longer sufficient to rely on *Heller's* dictum to find a statute is presumptively constitutional, particularly given the recent vintage of the two statutes at issue here. The Court must carefully examine the challenged statues under *Bruen's* originalist framework.

Under that originalist framework, the Second Amendment is "widely understood" to have codified a pre-existing right, the bounds of which are determined according to "*the public understanding* of [the text] in the period after its enactment or ratification." *Id.* at 2128. Its adoption "is the very *product* of an interest balancing by the people" and "[i]t is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Id.* at 2131.

That "unqualified deference" caused the Court to reject "the application of any 'judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statue's salutary effects upon other important government interests." *Id.* at 1229 (quoting *Heller*, 554 U.S. at 634). In doing so, the Court overturned all the Courts

25

of Appeals, which had unanimously concluded that firearms regulations were subject to means-ends interest balancing. *Bruen*, 142 S.Ct. at 2126. But the government interests at stake are no longer relevant to the constitutional inquiry. "Instead, the government must affirmatively prove that its firearms regulation is party of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

While the *Bruen* decision does not purport to undertake a comprehensive historical analysis, it does set out several useful guideposts for courts to follow:

1.  First, the relevant historical records should be close in time to the founding era when the Second Amendment was adopted in 1791, and potentially when the Fourteenth Amendment incorporated the Bill of Rights with respect to the States in 1868. *Id.* at 2136.[11]

2.  Second, the *Bruen* framework places the burden affirmatively on the government. The Court remarks, "we are not obligated to sift the historical

---

[11] *Bruen* acknowledged an ongoing scholarly debate on "whether courts should primarily rely on the prevailing understanding of individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope:"… but did not address the issue because the right "in both 1791 and 1868 was , for all relevant purposes, the same with respect to public carry." *Id.* at 2138. Whether the focus is on 1791 or 1868 likewise should not made a difference here because the oldest arguable analogues to 18 U.S.C. § 922(g) were not adopted until well into the twentieth century.

material for evidence to sustain New York's statue [because that] is respondent's burden." *Bruen*, 142 S.Ct. at 2150.

3. Third, the Court instructed that the analysis should be "fairly straightforward" with respect to regulations that address general societal problems that have existed since the 18th century:

> "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations address the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 2131.

4. Fourth, when presented with "unprecedented societal concerns or dramatic technological changes," courts must employ analogical reasoning. *Id.* at 2132. In doing so, the court considers whether the modern regulation and its historical analogues "impose a comparable burden on the right of armed self-defense and whether that burden is comparable justified." *Id. at 2133.*

5. Last, the Court cautions against defining the relevant unit of comparison too broadly. *Id.* at 2134. Using "sensitive places" as an example, the Court was skeptical that historical laws regulating carriage of firearms in "sensitive places" could justify "New York to effectively the island of Manhattan a

'sensitive place.'"[12]*Id.* at 2134. Courts are not free to define historical categories as broadly as they see fit, rather courts must assess the historical record of sensitive places where weapons were prohibited and "can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id. at 2133.*

*Bruen* essentially establishes two methods of reviewing the historical evidence of firearm regulations. The proper method depends on what kind of problem a statute is meant to address. The Court explained that in "some cases," a challenged regulation "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. For such regulations, the government must point to a robust tradition of "distinctly similar" historical regulations. *Id.* The Court then explained that in "other cases," a statute "implicat[es] unprecedented societal concerns or dramatic technological changes" or addresses a problem that was "unimaginable at the founding." *Id.* at 2132. For the latter regulations—and *only* the latter regulations—the government can use "analogical reasoning," which involves the "relevantly similar" inquiry. *Id.*

---

[12] ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of sensitive places far too broadly.")

The prohibition in the National Firearms Act (hereinafter "NFA"), 26 U.S.C. § 5801 *et seq*. which regulates possession of certain "short-barreled" firearms addresses problems which have "persisted since the 18th century." The Government outlined the problems which the NFA addresses in a recent publication from the Office of Public Affairs of the Department of Justice. The DOJ stated that the "National Firearms Act imposes heightened regulations on short-barreled rifles because they are easily concealable, can cause great damage, and are more likely to be used to commit crimes."[13] All three of these problems have persisted since the 18th century. When the regulated problem has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. *Bruen* 142 S. Ct. at 2131 (emphasis added).

Applying this framework, there is no basis in the Nation's history and tradition to uphold 26 U.S.C. § 5861(d).

**a. Short-barreled arms were common during the founding era and remain common today.**

---

[13] Press Release, DOJ, Justice Department Issues Proposed Rule and Model Legislation to Reduce Gun Violence (June 7, 2021), https://www.justice.gov/opa/pr/justice-department-issues-proposed-rule-and-model-legislation-reduce-gun-violence (last accessed 1/31/2024).

While regulation of short-barreled firearms is relatively new, dating only to the passage of the National Firearms Act in 1934, the existence of short-barreled weapons is not.[14] The Paget Carbine, with a barrel length of 16 inches, was introduced in the United Kingdom as early as 1800.[15] Various versions of the blunderbuss, firearms "boasting very short barrels, were popular for self-defense and occasionally used by militaries."[16] The Royal Armouries collection contains several examples of blunderbusses with barrels under 15 inches.[17] The American Revolution Institute has an eighteenth-century blunderbuss in its collection, "a type that was carried by British troops during the American Revolution," with "a short, large-

---

[14] D'Cruz, *supra* n.15, at 508 ("Short-barreled firearms, unlike modern 'assault weapons,' *did* exist at the time of the Second Amendment's drafting and ratification.").

[15] Royal Armouries Collections, *Flintlock muzzle-loading carbine – Short Light Cavalry Carbine (Experimental Paget Carbine) (About 1805)*, https://royalarmouries.org/collection/object/object-567 (last viewed 1/31/2024).

[16] D'Cruz, *supra* n.15, at 503.

[17] Royal Armouries Collections, *Flintlock  muzzle-loading blunderbuss – By Wheeler (about 1795),* https://royalarmouries.org/collection/object/object-30588 (last visited 1/31/2024); Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By J. Harding and Son (dated 1840),* https://royalarmouries.org/collection/object/object-15338(last visited 1/31/2024) (engraved "For Her Majesty's Mail Coaches"); Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By James Barbar,* https://royalarmouries.org/collection/object/object-15012(last visited 1/31/2024) (dated 1755).

caliber barrel just shy of fifteen inches."[18] And in "1861, the Federal government purchased 10,000 Augustin carbines, a short rifle initially used by cavalry units, with a 14.5 inch barrel."[19]

Arms with short barrels are popular for traveling or for close-range conflict: "Because of their size and tactical maneuverability, short-barrel firearms are ideal for self-defense."[20] Short-barreled rifles remain popular today, despite being heavily regulated. Over half a million short-barreled rifled are currently registered under the National Firearms Act.[21] AR-15 pistols equipped with a stabilizing brace, the unregulated, functional equivalent of short-barreled rifles, are even more popular.

---

[18] The American Revolution Institute, *Blunderbuss, the "Thunder Box" of the Battlefield*, https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/ (last visited 1/31/2024).

[19] D'Cruz, *supra* n.15, at 503-04 (internal quotations omitted, quoting Frederick P. Todd, American Military Equipage 1851-1872, at 134-35 (1980)).

[20] D'Cruz, *supra* n.15, at 514. Most of the historical examples of short-barreled arms were used by cavalry or coaches. *See, supra* n.82, 84, 85. Today, short-barreled arms remain popular truck guns. *See,* John B. Snow, *The Ultimate Truck Gun Build (Plus 14 More Guns for Your Pickup),* Outdoor Life (June 5, 2020 5:30 P.M), https://www.outdoorlife.com/story/guns/the-ultimate-truck-gun-build/ (last viewed 8/11/2022) (recommending an AR pistol modified with an SB tactical brace as "compact and portable" and "an excellent truck gun").

[21] Bureau Alcohol, Tobacco, Firearms, and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, at 16 (2021) (listing total short-barreled rifles registered at 532, 725 as of May 2021).

According to ATF, "manufacturers … have sold 3 million stabilizing braces since 2013."[22]

Under *Bruen* and *Heller*, "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *Bruen* 142 S.Ct. at 2128 (quoting *Heller,* 554 U.S. at 627)*.* By contrast, these cases conceded that the Second Amendment does not protect "dangerous and unusual weapons." *Id.* Rifles with short barrels are in common use, today and historically. They are no more dangerous or unusual that the handguns protected by *Bruen* and *Heller*, leading many to the inevitable conclusion that singling out short-barreled rifles for regulation is arbitrary.[23] There is no basis to exclude these arms from the protection of the Second Amendment.

---

[22] Factoring Criteria for Firearms with Attached "Stabilizing Braces," 86 Fed. Reg. 30826, 30827-30828 (June 10, 2021). For an example of this type of firearm recommended as a truck gun, *see* Snow, *supra* n. 87.

[23] *See* D'Cruz, *supra* n.15, at 536–37 ("The continued restriction of short-barrel firearms serves no purpose except to arbitrarily condemn citizens to grave penalties for what usually amounts to an honest mistake."); Stephen P. Halbrook, Firearms Law Deskbook § 8:10 (2021) (noting that in comparison to a short rifle, a handgun is a "far more concealable arm also with a barrel with a rifled bore"); Forrest Cooper, *SBR: The Arbitrary Infringement on a Short Barreled Rifle*, Recoil (August 20, 2021), https://www.recoilweb.com/sbr-the-arbitrary-infringement-on-a-short-barreled-rifle-169731.html (last visited 1/31/24) ("nothing better exemplifies" arbitrary restrictions "than the restrictions on owning a Short Barreled Rifle"); Press Release, U.S. Representative Tracey Mann, *Representative Tracey Mann Introduces the Home Defense and Competitive Shooting Act* (March 17, 2021), *available at* https://mann.house.gov/media/press-releases/representative-tracey-mann-introduces-home-defense-and-competitive-shooting (last visited 1/31/24) (introducing legislation to remove short-barreled rifles from the National Firearms Act and regulate them "under the same restrictions as other

**b. Discriminately regulating short-barreled rifles burdens rights protected by the Second Amendment and has no historical basis.**

Even though the National Firearms Act does not outright ban short-barreled rifles, it imposes unconstitutional burdens on the people. The registration requirements, for example, can entail "wait times for several months to a year."[24] And a violation could, as in the case before this Court, lead to a felony conviction and permanent disqualification in the future (see 18 U.S.C. §922(g)) (to the extent it survives *Bruen*)*.* This is unacceptable as the Supreme Court has made clear that the Constitution prohibits the government from imposing even de minimis burdens on fundamental rights.[25] As the Court observed in *Minneapolis Star*, the power to single out certain conduct for taxation "gives a government a powerful weapon against the taxpayer selected." 460 U.S. at 585.  And Justice Kavanaugh, dissenting in *Heller II*, opined that the Supreme Court's prior cases "suggest[] that registration of all lawfully possessed guns is not permissible under the Second Amendment." *Heller*

---

semiautomatic rifles).

[24] D'Cruz, *supra* n.15, at 511 (citing NFA Tracker at https://www.nfatracker.com/nfa-transfer-time-tracking/ (last visited 8/11/22)).

[25] *See Crawford v. Marion C'nty. Election Bd*., 553 U.S. 181, 191 (2008) ("However slight that burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.) (internal quotations omitted); *Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 592–93 (1983) (striking down "ink and paper tax" because a "tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action").

*v. District of Columbia*, 670 F.3d 1244, 1293 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). The *Bruen* case itself did not involve an outright ban, but a licensing scheme that required an application to demonstrate a special need for self-defense in order to carry handguns publicly. 142 S. Ct. at 2122. Like other regulations that burden constitutional rights, therefore, the restrictions on owning short-barreled firearms must pass *Bruen's* historical test.

The burden was on the government to prove that the restrictions imposed by the National Firearms Act are historically based. It failed to do so. The purported problems posed by short-barreled firearms have existed since the 18th century, and therefore under *Bruen*, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 1231. The inquiry is "fairly straightforward" and the statute is unconstitutional. *Id.*

**c.  *United States v. Miller* Does not require a different result.**

The district court's analysis in the instant case relied heavily on *United States v. Miller,* 307 U.S. 174, 178 (1939). Shortly after the passage of the National Firearms Act, in 1939 the Supreme Court in *Miller* upheld the Act as constitutional as applied to short-barreled shotguns. *Id*. The case has been criticized on numerous grounds. The Court decided the case without hearing from the defendants, whose

lawyer did not submit briefing or appear for oral argument.[26] The opinion itself is "quite terse," "consists primarily of lengthy quotations and string cites," and is "anchored by a few paragraphs of crabbed analysis."[27] Instead of examining the historical records, the Court relied on "the absence of any evidence" showing that short-barreled shotguns were useful defensive weapons, and claiming that such evidence was "not within judicial notice." *Miller*, 307 U.S. at 178. On this score, one writer concluded the opinion amounts to "ignorance, whether willful or innocent."[28] Perhaps because of these limitations, in *Heller*, the Supreme Court cautioned: "It is particularly wrongheaded to read *Miller* for more than what it said, because the case did even purport to be a thorough examination of the Second Amendment." *Heller,* 554 U.S. at 621.

What, then, does *Miller* say about regulation of short-barreled rifles? In short, nothing. The facts of that case related only to short-barreled shotguns, which is a different type of weapon than is at issue here. *Miller,* 307 U.S. at 178; 28 U.S.C.§ 5845 (c) (defining "rifle" and § 5845(d) (defining shotgun). It remains axiomatic that "regardless of what a court says in its opinion, the decision can hold nothing

---

[26] Brian L. Frye, *The Peculiar Story of United States v. Miller*, 3 N.Y.U. J. of L. & Liberty, 48, 66-67 (2008).

[27] *Id.*

[28] D'Cruz, *supra* n.15, at 503; *see also* Section 5.a., describing the historical use of short-barreled arms.

beyond the facts of that case." *Edwards v. Prime, Inc*., 602 F.3d 1276, 1298 (11th Cir. 2010). And by its own terms, the case turned on the characteristics of short-barreled shotguns and "the absence of any evidence" tending to show they could contribute to the common defense. *Miller*, 307 U.S. at 178. A different type of weapon compels a new analysis, conducted in accordance with the *Bruen* framework.

**d. The Government has failed to show that 26 U.S.C. § 5861(d) is consistent with the Nation's historical tradition of firearm regulation.**

The modern regulation of §5861(d) fails *Bruen*'s first "relevant metric," because it does not "impose a comparable burden on the right of armed self-defense" to any of the historical laws cited. *Bruen* 142 S. Ct.  at 2132-33. The burden is much more severe. At the district court level the Government identified several regulations that say nothing about the prohibition on possession of a short-barreled rifle, the kind Appellant Rush is alleged to have possessed. The Government discussed why machine guns are "dangerous and unusual," but Appellant Rush was never charged with possession of a machine gun. (DCD_38 at 6).  The Government also cited as "historical sources under the second prong of the *Bruen* test" 18 U.S.C. §§ 922(a)(1)(A), 922(b)(3), 923(g), and 922(k), none of which were remotely enacted or contemplated during the 18th century. But *Bruen* cautioned that "[h]istorical evidence that long predates [the ratification] ... may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Bruen,* 142

36

S. Ct. at 2136. Likewise, courts "must also guard against giving postenactment history more weight than it can rightly bear," by only considering those postenactment sources that help "determine *the public understanding* of [the Second Amendment]" at the time of its ratification. *Id.* (emphasis and alteration in original) (citation omitted).

The Government also cited to several journal articles to support their contention that some colonial laws were enacted "regarding the registration of firearms as part of the legislative schemes regarding the sale, transfer, and taxation of firearms." (DCD_38, at 11). The Government then discussed selling firearms, transferring firearms, taxing firearms, and finally, registering firearms—as part of a "mandatory muster[] scheme," to "ensur[e] a functional militia." *Id*. The Government did not quote the text of or cite to a single law from the relevant time period supporting any historical traditions of prohibiting or of regulating short-barreled rifles, or of requiring the registry of short-barreled rifles, or of punishing those who possessed them. None of the Government's examples come close to satisfying the *Bruen* test. In fact, the Government did not even show that short-barreled rifles were not in common use at the time for the purpose of self-defense.

*Bruen*'s second "relevant metric" is "whether that regulatory burden is comparably justified." But in this case, because the Government *did not provide any distinctly similar or relevantly similar examples* of a historical example or analogue

37

of a "comparable burden" to the regulation in §5861(d), a court need not even consider the question of whether that burden is "comparably justified." Courts "should not "uphold every modern law that remotely resembles a historical analogue," because doing so" risk[s] endorsing outliers that our ancestors would never have accepted." *Bruen*, 142 S. Ct. at 2133 (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). The Government did not proffer a single analogous restriction remotely comparable to § 5861(d) which would have been acceptable to our American ancestors in the years close to 1791. Because the Government failed to carry its burden, this Court's task is "fairly straightforward". *Bruen*, 142 S. Ct. at 2131.

## **CONCLUSION**

Under *Bruen*, the question for the Court is whether the government has "affirmatively prove[n] that 26 U.S.C. §5861(d) is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. 2111 at 2127. Because the statute challenged here is not part of this Nation's history and tradition, it imposes unconstitutional restrictions on the Second Amendment right to keep and bear arms.

For the foregoing reasons, Counsel asks the Court to find that the district court erred in denying his motion to dismiss. Appellant asks this Court to reverse the decision of the district court, remand this matter to the district court to allow

Appellant to withdraw his plea of guilty, and instruct the district court to then dismiss the superseding indictment against him, with prejudice; and for such further relief as the Court may deem just and proper in the premises.

Respectfully submitted,

NEWTON BARTH, L.L.P

By: s/ Talmage E. Newton IV
Talmage E. Newton, IV ARDC6305302
talmage@newtonbarth.com
555 Washington Ave., Ste. 420
St. Louis, Missouri 63101
(314) 272-4490 – Office
(314) 762-6710 – Facsimile

*Attorney for Appellant-Defendant*
*Jamond M. Rush*

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32

(a)(7)(B) because:

__X__ this brief contains 6575 words, excluding the parts of the brief exempted by

Fed. R. App. P. 32(a)(7)(B)(i), and is less than 30 pages.


s/ Talmage E. Newton IV_____
Attorney for Appellant-Defendant

Dated: February 6, 2024

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 23-3256

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

JAMOND M. RUSH,

Defendant - Appellant

On Appeal from the
United States District Court for
the Southern District of Illinois
Case No. 4:22-cr-40008-JPG
The Honorable Judge J. Phil Gilbert

**APPELLANT'S REQUIRED SHORT APPENDIX**

**NEWTON BARTH, L.L.P.**

By:   s/ Talmage E. Newton IV
      Talmage E. Newton IV, ARDC6305302
      555 Washington Ave., Ste. 420
      St. Louis, Missouri 63101
      Telephone:  (314) 272-4490
      Facsimile:   (314) 762-6710
      tnewton@newtonbarth.com

      ***ATTORNEY FOR APPELLANT
      JAMOND RUSH***

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

No. 23-3256

---

UNITED STATES OF AMERICA,
                                                            Plaintiff – Appellee

v.

JAMOND M. RUSH,
                                                            Defendant - Appellant

---

On Appeal from the United States District Court
for the Southern District of Illinois
Case No. 4:22-cr-40008-JPG
The Honorable Judge J. Phil Gilbert

---

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

The undersigned counsel for Defendant-Appellant hereby states that all of the material required by Cir. R. 30(a) and 30(b) are included in the Appendix to this brief.

By:    s/ Talmage E. Newton IV

Dated: February 6, 2024

## **PROOF OF SERVICE**

The undersigned attorney hereby certifies that he has caused a copy of the foregoing to be filled with the Clerk of Court using CM/ECF system and served, by the electronic filing system, upon all attorneys of record, on this 6th day of February 2024.

The undersigned attorney hereby certifies that he has enclosed the same in an envelope with postage fully prepaid and by depositing said envelope in a U.S. Post Office mailbox in St. Louis, Missouri on the 6th day of February 2024 to:

Mr. Jamond M. Rush, Reg # 99310-509
FCI Yazoo City Medium
2225 Haley Barbour Parkway
Yazoo City, MS 39194

By:    s/ Talmage E. Newton IV

# **APPENDIX**

Certificate of Compliance with Circuit Rule 30 …………………………………… 42

Proof of Service ……………………………………………………………………… 43

Judgment …………………………………………………………………... SA_001

Superseding Indictment ………………………………………………… SA_008

Defendant's Motion to Dismiss (district court) …………………………….SA_010

Government's Response to the Motion to Dismiss (district court) ……… SA_024

Defendant's Reply in Support of Dismissal …………………………….. SA_038

Court Order Denying Motion to Dismiss ………………………………… SA_046

Plea Agreement ………………………………………………………….. SA_052

Notice of Appeal ……………………………………………………….. SA_065

AO 245B (SDIL Rev. 7/21) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
### Southern District of Illinois

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | Case Number: **4:22-CR-40008-JPG-1**<br>USM Number: **99310-509** |
| **JAMOND M. RUSH** | **TALMAGE E. NEWTON, IV**<br>Defendant's Attorney |

**THE DEFENDANT:**

☒ pleaded guilty to count(s)  1 of the Superseding Indictment

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 26 U.S.C. § 5861(d) | Receipt or Possession of Unregistered Firearm | 2/7/2022 | 1s |

      The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)  ☐ is ☐ are dismissed on the motion of the United States.

☐ No fine     ☐ Forfeiture pursuant to order filed  , included herein.

☒ Forfeiture pursuant to Order of the Court. See page 7 for specific property details.

      It is ordered that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Restitution and/or fees may be paid to:
Clerk, U.S. District Court*
750 Missouri Ave.
East St. Louis, IL 62201

*Checks payable to: Clerk, U.S. District Court

November 21, 2023
Date of Imposition of Judgment

Signature of Judge
J. Phil Gilbert, U.S. District Judge
Name and Title of Judge

Date Signed: November 21, 2023

SA_001

AO 245B (SDIL Rev. 7/21) Judgment in a Criminal Case

Judgment Page 2 of 7

DEFENDANT: Jamond M. Rush
CASE NUMBER: 4:22-cr-40008-JPG-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of **30 months as to Count 1 of the Superseding Indictment. This term of imprisonment shall run concurrently with his pending related case, State of Illinois, (Pulaski County) case number 22-CF-08.**

☐   The court makes the following recommendations to the Bureau of Prisons:

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on

    ☐ as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**SA_002**

AO 245B (SDIL Rev. 7/21) Judgment in a Criminal Case

Judgment Page 3 of 7

DEFENDANT: Jamond M. Rush
CASE NUMBER: 4:22-cr-40008-JPG-1

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **2 years as to Count 1 of the Superseding Indictment.**

Other than exceptions noted on the record at sentencing, the Court adopts the presentence report in its current form, including the suggested terms and conditions of supervised release and the explanations and justifications therefor.

## MANDATORY CONDITIONS

*The following conditions are authorized pursuant to 18 U.S.C. § 3583(d):*

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the Court, not to exceed 52 tests in one year.

The defendant shall cooperate in the collection of DNA as directed by the probation officer.

## ADMINISTRATIVE CONDITIONS

*The following conditions of supervised release are administrative and applicable whenever supervised release is imposed, regardless of the substantive conditions that may also be imposed. These conditions are basic requirements essential to supervised release.*

The defendant must report to the probation office in the district to which the defendant is released within seventy-two hours of release from the custody of the Bureau of Prisons.

The defendant shall not knowingly possess a firearm, ammunition, or destructive device. The defendant shall not knowingly possess a dangerous weapon unless approved by the Court.

The defendant shall not knowingly leave the federal judicial district without the permission of the Court or the probation officer.

The defendant shall report to the probation officer in a reasonable manner and frequency directed by the Court or probation officer.

The defendant shall respond to all inquiries of the probation officer and follow all reasonable instructions of the probation officer.

The defendant shall notify the probation officer prior to an expected change, or within seventy-two hours after an unexpected change, in residence or employment.

AO 245B (SDIL Rev. 7/21) Judgment in a Criminal Case

Judgment Page 4 of 7

DEFENDANT: Jamond M. Rush
CASE NUMBER: 4:22-cr-40008-JPG-1

The defendant shall not knowingly meet, communicate, or otherwise interact with a person whom the defendant knows to be engaged, or planning to be engaged, in criminal activity.

The defendant shall permit a probation officer to visit the defendant at a reasonable time at home or at any other reasonable location and shall permit confiscation of any contraband observed in plain view of the probation officer.

The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

## SPECIAL CONDITIONS

*Pursuant to the factors in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3583(d), the following special conditions are ordered. While the Court imposes special conditions, pursuant to 18 U.S.C. § 3603(10), the probation officer shall perform any other duty that the Court may designate. The Court directs the probation officer to administer, monitor, and use all suitable methods consistent with the conditions specified by the Court and 18 U.S.C. § 3603 to aid persons on probation/supervised release. Although the probation officer administers the special conditions, final authority over all conditions rests with the Court.*

The defendant shall participate in treatment for narcotic addiction, drug dependence, or alcohol dependence, which includes urinalysis and/or other drug detection measures and which may require residence and/or participation in a residential treatment facility, or residential reentry center (halfway house). The number of drug tests shall not exceed 52 tests in a one-year period. Any participation will require complete abstinence from all alcoholic beverages and any other substances for the purpose of intoxication. The defendant shall pay for the costs associated with services rendered, based on a Court approved sliding fee scale and the defendant's ability to pay. The defendant's financial obligation shall never exceed the total cost of services rendered. The Court directs the probation officer to approve the treatment provider and, in consultation with a licensed practitioner, the frequency and duration of counseling sessions, and the duration of treatment, as well as monitor the defendant's participation, and assist in the collection of the defendant's copayment.

While any financial penalties are outstanding, the defendant shall provide the probation officer and the Financial Litigation Unit of the United States Attorney's Office any requested financial information. The defendant is advised that the probation office may share financial information with the Financial Litigation Unit.

While any financial penalties are outstanding, the defendant shall apply some or all monies received, to be determined by the Court, from income tax refunds, lottery winnings, judgments, and/or any other anticipated or unexpected financial gains to any outstanding court-ordered financial obligation. The defendant shall notify the probation officer within 72 hours of the receipt of any indicated monies.

The defendant shall pay any financial penalties imposed which are due and payable immediately. If the defendant is unable to pay them immediately, any amount remaining unpaid when supervised release commences will become a condition of supervised release and be paid in accordance with the Schedule of Payments sheet of the judgment based on the defendant's ability to pay.

SA_004

AO 245B (SDIL Rev. 7/21) Judgment in a Criminal Case

Judgment Page 5 of 7

DEFENDANT: Jamond M. Rush
CASE NUMBER: 4:22-cr-40008-JPG-1

The defendant's person, residence, real property, place of business, vehicle, and any other property under the defendant's control is subject to a search, conducted by any United States Probation Officer and other such law enforcement personnel as the probation officer may deem advisable and at the direction of the United States Probation Officer, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release, without a warrant. Failure to submit to such a search may be grounds for revocation. The defendant shall inform any other residents that the premises and other property under the defendant's control may be subject to a search pursuant to this condition.

**U.S. Probation Office Use Only**

A U.S. Probation Officer has read and explained the conditions ordered by the Court and has provided me with a complete copy of this Judgment. Further information regarding the conditions imposed by the Court can be obtained from the probation officer upon request.

Upon a finding of a violation of a condition(s) of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.


Defendant's Signature _____     Date _____


U.S. Probation Officer _____     Date _____

SA_005

AO 245B (SDIL Rev. 7/21) Judgment in a Criminal Case

Judgment Page 6 of 7

DEFENDANT: Jamond M. Rush
CASE NUMBER: 4:22-cr-40008-JPG-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $100.00 | $-0- | $100.00 | $-0- | $-0- |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |

☐ Restitution amount ordered pursuant to plea agreement $_____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).
The court determined that the defendant does not have the ability to pay interest and it is ordered that:
☒ the interest requirement is waived for ☒ fine ☐ restitution.
☐ the interest requirement for ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (SDIL Rev. 7/21) Judgment in a Criminal Case

Judgment Page **7** of **7**

DEFENDANT: Jamond M. Rush
CASE NUMBER: 4:22-cr-40008-JPG-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A.** ☐ Lump sum payment of $_____ due immediately, balance due
  ☐ not later than _____, or
  ☐ in accordance ☐ C, ☐ D, ☐ E, or ☐ F below; or
**B.** ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☒ F below; or
**C.** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $_____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or
**D.** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $_____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or
**E.** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or
**F.** ☒ Special instructions regarding the payment of criminal monetary penalties:
  **All criminal monetary penalties are due immediately and payable through the Clerk, U.S. District Court. Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be paid in equal monthly installments of $10 or ten percent of his net monthly income, whichever is greater. The defendant shall pay any financial penalty that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several
  Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  The defendant shall forfeit the defendant's interest in the following property to the United States: **An Anderson Manufacturing AR-15 rifle, bearing serial number 20318514, and all ammunition seized therewith.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 22-40008-JPG |
| | ) | |
| v. | ) | |
| | ) | Title 26, United States Code, Sections |
| JAMOND M. RUSH, | ) | 5841, 5861(d), and 5871 |
| | ) | |
| Defendant. | ) | |

**FILED**

AUG 1 6 2022

**FIRST SUPERSEDING INDICTMENT**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

THE GRAND JURY CHARGES:

## COUNT 1

### RECEIPT OR POSSESSION OF UNREGISTERED FIREARM

On or about February 7, 2022, in Pulaski County, Illinois, within the Southern District of Illinois, the defendant

**JAMOND M. RUSH**

knowing received or possessed a firearm as defined in Title 26, United States Code, Section 5845(a)(3), being an Anderson Manufacturing AR-15 rifle, bearing serial number 20318514, having a barrel of less than 16 inches, which was not registered to him in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

### FIREARM FORFEITURE ALLEGATION

1.      The allegations contained in Count 1 above are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 26, United States Code, Section 5872 and Title 28, United States Code, Section 2461(c).

2.      Upon conviction of the above offense in violation of Title 26, United States Code, Section 5861(d), the defendant

**JAMOND M. RUSH**

shall forfeit to the United States, pursuant to Title 26, United States Code, Section 5872 and Title 28, United States Code, Section 2461(c), any firearm involved or used in the knowing

1

commission of the offense, including, but not limited to:

an Anderson Manufacturing AR-15 rifle, bearing serial number 20318514;

all pursuant to Title 26, United States Code, Section 5872 and Title 28, United States Code, Section 2461(c).

**A TRUE BILL**

**FOREPERSON**

ALMA
SUMMERS    Digitally signed by
ALMA SUMMERS
Date: 2022.08.15
12:44:00 -05'09'    for

**RACHELLE AUD CROWE**
**United States Attorney**

**CASEY E. A. BLOODWORTH**
**Assistant United States Attorney**

Recommended Bond: Detention

2

**SA_009**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.:    4:22-cr-40008-JPG |
| | ) | |
| JAMOND M. RUSH, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO DISMISS INDICTMENT
## & SUGGESTIONS IN SUPPORT OF DISMISSAL

COMES NOW Defendant Jamond M. Rush, by and through his undersigned counsel, and pursuant to the Second Amendment to the United States Constitution and the recent holding by the United States Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 211 (2022), respectfully moves the Court to dismiss the instant indictment, and in support thereof, states as follows:

The indictment against Mr. Rush charges the defendant with possessing an unregistered, short-barreled rifle in violation of 26 U.S.C. §5861(d), which imposes criminal penalties on anyone who possesses a short-barreled rifle without complying with the National Firearms Act's taxation and registration requirements. This statute burdens core conduct covered by the Second Amendment, which protects "the right of the people to keep and bear Arms" both in the home[1] and in public.[2]

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms").

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2122 (2022) ("[T]he Second and Fourteenth Amendments protect and individual's right to carry a handgun for self-defense outside the home.".)

SA_010

In June of this year, the Supreme Court decided *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 211 (2022). The Court in *Bruen* overturned existing law in every circuit and held that the rights guaranteed by the Second Amendment are not subject to any interest balancing or means-ending scrutiny, explaining, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."[3] To then justify regulating protected conduct, "the government may not simply posit that the regulation promotes an important interest."[4] "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition the delimits the outer bounds of the right to keep and bear arms."[5] The government cannot meet its burden with respect to 26 U.S.C. § 5861(d).

The National Firearms Act, 26 U.S.C. §5861(d), dates only to the early twentieth century. It was first enacted in 1934 and imposes stiff criminal penalties on anyone who receives or possesses a short-barreled rifle that is not registered in the National Firearms Registration and Transfer Records.[6] The first version of the statue was upheld as a valid exercise of Congress's authority to tax.[7] Despite purporting to regulate firearms associated with criminal activity,[8] the Act

---

[3] *Id*. at 2125-26.

[4] *Id*. at 2126.

[5] *Id*. at 2127.

[6] National Firearms Act of 1934, Pub L. No. 730474, 48 State. 1236-1240.

[7] *See Sonzinsky v. United States*, 300 U.S. 506, 514 (1937) ("since it operates as a tax, it is within the national taxing power").

[8] The National Firearms Act regulated arms "that had gained reputations as gangster weapons" and has been characterized as "a symbolic denunciation of firearms in the hands of criminals." Elliott Buckman, *Just a Soul Whose Intentions Are Good? The Relevance of A Defendant's Subjective Intent in Defining A "Destructive Device"*

SA_011

covers arms that are in common use.[9] And the Act imposes these heightened restrictions and penalties on short-barreled rifles, even though they "have no discernable operational differences from firearms excluded from the Act," such as pistols and other handguns.[10]

26 U.S.C. §5861(d) is a twentieth century innovation that burden constitutionally protected conduct. Regulations did not exist during the founding era that taxed or registered short-barreled arms. And, as discussed further below, such regulations have no historical analogue. The government therefore cannot meet its burden to prove these regulations are consistent with the Nation's historical tradition of firearms regulation. The indictment must therefore be dismissed.

1. **The Indictment charges Mr. Rush with unlawful gun possession under a criminal statute which categorically burdens his rights under the Second Amendment.**

The indictment charges Mr. Rush with the possession was unlawful because the rifle had a short barrel and should have been registered under the National Firearm Act, but was not so registered. *Id*.

To determine whether a government regulation implicates the Second Amendment, *Bruen* asks whether "the Second Amendment's plain text covers an individual's conduct."[11] The answer to that question is not difficult in this case. The Second Amendment protects the right of the people

---

*Under the National Firearms Act,* 79 Fordham L. Rev. 563, 570-571 (2010) (quoting Franklin E. Zimring, *Firearms and Federal Law; The Gun Control Act of 1968*, 4 J. Legal Stud. 133, 143 (1975)).

[9] Over half-a-million short-barreled rifles are currently registered with the federal government. Bureau Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, at 16 (2021) (listing total short-barreled rifles registered at 532, 725 as of May 2021).

[10] James A. D'Cruz, *Half-Cocked" The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 496 (2017).

[11] *Bruen*, 142 S. Ct. at 2126

SA_012

to "keep and bear arms." The conduct proscribed by 26 U.S.C. §5861(d), possession of a firearm, easily qualifies as "keep[ing]" and "bear[ing]" arms.[12] And 26 U.S.C. §5861(d) applies to everyone, necessarily impacting "the right of the people." Because the Second Amendment's plain text covers the conduct at issue in 26 U.S.C. §5861(d), the Constitution presumptively protects that conduct.

### 2. The *Bruen* framework centers Second Amendment analysis on the public understanding of the text at time of its adoption.

In *Heller*, the Supreme Court's landmark case establishing and individual right to keep arms, the Court remarked that nothing in its "opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."[13] The Eleventh Circuit, along with several others, took this statement to mean that the lower courts need not critically examine such prohibitions.[14] In *Rozier*, the Eleventh Circuit relied exclusively on Heller's language to hold that 18 U.S.C. § 922(g) is "a constitutional avenue to restrict the Second Amendment right of certain classes of people."[15] The *Rozier* decision contains no additional analysis, historical or otherwise. But other judges and scholars have noted that conspicuous lack of historical justifications for *Heller's* casual assertion that longstanding firearm regulations are presumed constitutional.[16]

---

[12] *See Heller*, 554 U.S. at 628-629 (holding statute that barred possession of handguns in the home unconstitutional.)

[13] *Heller*, 554 U.S. at 626

[14] *See, e.g., United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010)

[15] *Id.* at 771

[16] *See Kanter v. Barr*, 919 F.33 437, 453 (7th Cir. 2019) Barrett, J., dissenting ("*Heller* did not undertake an exhaustive historical analysis" and "*Heller's* dictum does not settle the question before us"); *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015) (Manion, J., dissenting) (noting Heller's presumption "is very different thing from an assertion: we presume that laws are constitutional until and unless the regulation is

The Supreme Court's recent decision in *Bruen*, which abrogates *Rozier*, demands a fresh look at 18 U.S.C. § 922(g)(1) and the National Firearms Act through the lens of the Second Amendment's text, history, and tradition. The *Bruen* decision could not be clearer: "the government must **affirmatively prove** that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[17] It is no longer sufficient to rely on *Heller's* dictum to find a statute is presumptively constitutional, particularly give the recent vintage of the two statutes at issue here. The Court must carefully examine the challenged statues under *Bruen's* originalist framework.

Under that framework, the Second Amendment is "widely understood" to have codified a pre-existing right, the bounds of which are determined according to "*the public understanding* of [the text] in the period after its enactment or ratification."[18] Its adoption "is the very *product* of an interest balancing by the people" and "[i]t is this balance – struck by the traditions of the American people – that demands our unqualified deference."[19]

---

challenged and a competent court informs us otherwise"); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 254 (2020) ("it would be unreasonable to read *Heller's* 'presumptively lawful' as 'conclusively lawful'")' Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 414 (2009) ("what is less clear, under the majority's reading of the [Second] Amendment, is why [felons and the mentally ill] should be" excluded from protection: Larson, *supra* n.10 at 1372 ("The Court offered no citations to support this statement and its ad hoc, patchy quality has been readily apparent to commentators, who have speculated that it was compromised language designed to secure Justice Kennedy's vote.").

[17] *Bruen*, 142 S. Ct. at 2127 (emphasis added).

[18] *Id.* at 2128.

[19] *Id.* at 2131.

That "unqualified deference" caused the Court to reject "the application of any 'judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statue's salutary effects upon other important government interests."[20] In doing so, the Court overturned all of the Court of Appeals, which had unanimously concluded that firearms regulations were subject to means-ends interest balancing.[21] But the government interests at stake are no longer relevant to the constitutional inquiry. "Instead, the government must affirmatively prove that its firearms regulation is party of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[22]

While the *Bruen* decision does not purport to undertake a comprehensive historical analysis, it does set out several useful guideposts for courts to follow:

1. First, the relevant historical records it the founding era when the Second Amendment was adoption in 1791, and potentially when the Fourteenth Amendment incorporated the Bill of Rights with respect to the States in 1868.[23]

---

[20] *Id.* at 1229 (quoting *Heller*, 554 U.S. at 634).

[21] *Bruen*, 142 S. Ct. at 2126

[22] *Id.* at 2127

[23] *Id.* at 2136. *Bruen* acknowledged an ongoing scholarly debate on "whether courts should primarily rely on the prevailing understanding of individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope:"… but did not address the issue because the right "in both 1791 and 1868 was , for all relevant purposes, the same with respect to public carry." *Id.* at 2138. Whether the focus is on 1791 or 1868 likewise should not made a difference here because the oldest arguable analogues to 18 U.S.C. § 922(g) were not adopted until well into the twentieth century.

2.  Second, the *Bruen* framework places the burden affirmatively on the government. The

    Court remarks, "we are not obligated to sift the historical material for evidence to sustain

    New York's statue [because that] is respondent's burden."[24]

3.  Third, the Court instructed that the analysis should be "fairly straightforward" with respect

    to regulations that address general societal problems that have existed since the 18th

    century:

    For instance, when a challenged regulation addresses a general societal problem that has
    persisted since the 18th century, the lack of a distinctly similar historical regulation
    addressing that problem is relevant evidence that the challenged regulation is inconsistent
    with the Second Amendment. Likewise, if earlier generations address the societal problem,
    but did so through materially different means, that also could be evidence that a modern
    regulation is unconstitutional.[25]

4.  Fourth, when presented with "unprecedented societal concerns or dramatic technological

    changes," courts must employ analogical reasoning.[26] In doing so, the court considers

    whether the modern regulation and its historical analogues "impose a comparable burden

    on the right of armed self-defense and whether that burden is comparable justified."[27]

5.  Last, the Court cautions against defining the relevant unit of comparison too broadly.[28]

    Using "sensitive places" as an example, the Court was skeptical that historical laws

    regulating carriage of firearms in "sensitive places" could justify "New York to effectively

---

[24] *Bruen*, 142 S. Ct. at 2150.

[25] *Id.* at 2131.

[26] *Id*. at 2132.

[27] *Id*. at 2133.

[28] *Id*. at 2134.

the island of Manhattan a 'sensitive place.'"[29] Courts are not free to define historical categories as broadly as they see fit, rather courts must assess the historical record of sensitive places where weapons were prohibited and "can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."[30]

Applying this framework, there is no basis in the Nation's history and tradition to uphold 18 U.S.C. § 922(g) or 26 U.S.C. § 5861(d).

### 3. There is no historical analogue for taxing and registering short-barreled weapons, nor for criminalizing failure to comply with taxation and registration requirements.

#### a. Short-barreled arms were common during the founding era and remain common today.

While regulation of short-barreled firearms is relatively new, dating only to the passage of the National Firearms Act in 1934, the existence of short-barreled weapons is not.[31] The Paget Carbine, with a barrel length of 16 inches, was introduced in the United Kingdom as early as 1800.[32] Various versions of the blunderbuss, firearms "boasting very short barrels, were popular

---

[29] *Id*. at 2134. ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of sensitive places far too broadly.")

[30] *Id*. at 2133.

[31] D'Cruz, *supra* n.15, at 508 ("Short-barreled firearms, unlike modern 'assault weapons,' *did* exist at the time of the Second Amendment's drafting and ratification.").

[32] Royal Armouries Collections, *Short Light Cavalry Carbine (Paget Carbine) (About 1800-1808)*, https://collections.royalarmouries.org/battle-of-waterloo/arms-and-armour/type/rac-narrative-569.html (last visited 8/11/2022); *see also* Royal Armouries Collections, *Flintlock muzzle-loading carbine – Short Light Cavalry Carbine (Experimental Paget Carbine) (About 1805)*, https://collections.royalarmouries.org/object/rac-object-567.html (last viewed 8/11/2022).

for self-defense and occasionally used by militaries."[33] The Royal Armouries collection contains several examples of blunderbusses with barrels under 15 inches.[34] The American Revolution Institute has an eighteenth-century blunderbuss in its collection, "a type that was carried by British troops during the American Revolution," with "a short, large-caliber barrel just shy of fifteen inches."[35] And in "1861, the Federal government purchased 10,000 Augustin carbines, a short rifle initially used by cavalry units, with a 14.5 inch barrel."[36]

Arms with short barrels are popular for traveling or for close-range conflict: "Because of their size and tactical maneuverability, short-barrel firearms are ideal for self-defense."[37] Short-barreled rifles remain popular today, despite being heavily regulated. Over half a million short-

---

[33] D'Cruz, *supra* n.15, at 503.

[34] Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By Wheeler (about 1795),* https://collections.royalarmouries.org/object/rac-object-30588.html (last visited 8/11/2022); Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By J. Harding and Son (dated 1840),* https://collections.royalarmouries.org/object/rac-object-15338.html (last visited 8/11/2022) (engraved "For Her Majesty's Mail Coaches"); Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By James Barbar,* https://collections.royalarmouries.org/object/rac-object-15012.html (last visited 8/11/2022) (dated 1755).

[35] The American Revolution Institute, *Blunderbuss, the "Thunder Box" of the Battlefield*, https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/ (last visited 8/11/2022).

[36] D'Cruz, *supra* n.15, at 503-04 (internal quotations omitted, quoting Frederick P. Todd, American Military Equipage 1851-1872, at 134-35 (1980)).

[37] D'Cruz, *supra* n.15, at 514. Most of the historical examples of short-barreled arms were used by cavalry or coaches. *See, supra* n.82, 84, 85. Today, short-barreled arms remain popular truck guns. *See,* John B. Snow, *The Ultimate Truck Gun Build (Plus 14 More Guns for Your Pickup),* Outdoor Life (June 5, 2020 5:30 P.M), https://www.outdoorlife.com/story/guns/the-ultimate-truck-gun-build/ (last viewed 8/11/2022) (recommending an AR pistol modified with an SB tactical brace as "compact and portable" and "an excellent truck gun").

barreled rifled are currently registered under the National Firearms Act.[38] AR-15 pistols equipped with a stabilizing brace, the unregulated, functional equivalent of short-barreled rifles, are even more popular. According to ATF, "manufacturers … have sold 3 million stabilizing braces since 2013."[39]

Under *Bruen* and *Heller*, "the Second Amendment protects the possession and use of weapons that are 'in common use.'"[40] By contrast, these cases conceded that the Second Amendment does not protect "dangerous and unusual weapons."[41] Rifles with short barrels are in common use, today and historically. They are no more dangerous or unusual that the handguns protected by *Bruen* and *Heller*, leading many to the inevitable conclusion that singling out short-barreled rifles for regulation is arbitrary.[42] There is no basis to exclude these arms from the protection of the Second Amendment.

---

[38] Bureau Alcohol, Tobacco, Firearms, and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, at 16 (2021) (listing total short-barreled rifles registered at 532, 725 as of May 2021).

[39] Factoring Criteria for Firearms with Attached "Stabilizing Braces," 86 Fed. Reg. 30826, 30827-30828 (June 10, 2021). For an example of this type of firearm recommended as a truck gun, *see* Snow, *supra* n. 87.

[40] *Bruen*, 142 S. Ct. at 2128 (quoting *Heller,* 554 U.S. at 627).

[41] *Id.*

[42] *See* D'Cruz, *supra* n.15, at 536–37 ("The continued restriction of short-barrel firearms serves no purpose except to arbitrarily condemn citizens to grave penalties for what usually amounts to an honest mistake."); Stephen P. Halbrook, Firearms Law Deskbook § 8:10 (2021) (noting that in comparison to a short rifle, a handgun is a "far more concealable arm also with a barrel with a rifled bore"); Forrest Cooper, *SBR: The Arbitrary Infringement on a Short Barreled Rifle*, Recoil (August 20, 2021), https://www.recoilweb.com/sbr-the-arbitrary-infringement-on-a-short- barreled-rifle-169731.html (last visited 8/11/22) ("nothing better exemplifies" arbitrary restrictions "than the restrictions on owning a Short Barreled Rifle"); Press Release, U.S. Representative Tracey Mann, *Representative Tracey Mann Introduces the Home Defense and Competitive Shooting Act* (March 17, 2021), *available at*

**b.  Discriminately regulating short-barreled rifles burdens rights protected by the Second Amendment and has no historical basis.**

Even though the National Firearms Act does not outright ban short-barreled rifles, it imposes unconstitutional burdens on the people. The registration requirements, for example, can entail "wait times for several months to a year."[43] And the Supreme Court has made clear that the Constitution prohibits the government from imposing even de minimis burdens on fundamental rights.[44] As the Court observed in *Minneapolis Star*, the power to single out certain conduct for taxation "gives a government a powerful weapon against the taxpayer selected."[45] And Justice Kavanaugh, dissenting in *Heller II*, opined that the Supreme Court's prior cases "suggest[] that registration of all lawfully possessed guns is not permissible under the Second Amendment."[46] The *Bruen* case itself di not involve an outright ban, but a licensing scheme that required an application to demonstrate a special need for self-defense in order to carry handguns publicly.[47]

---

https://mann.house.gov/media/press-releases/representative-tracey- mann-introduces-home-defense-and-competitive-shooting (introducing legislation to remove short-barreled rifles from the National Firearms Act and regulate them "under the same restrictions as other semiautomatic rifles").

[43] D'Cruz, *supra* n.15, at 511 (citing NFA Tracker at https://www.nfatracker.com/nfa-transfer-time-tracking/ (last visited 8/11/22)).

[44] *See Crawford v. Marion C'nty. Election Bd.*, 553 U.S. 181, 191 (2008) ("However slight that burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.) (internal quotations omitted); *Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 592–93 (1983) (striking down "ink and paper tax" because a "tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action").

[45] 460 U.S. at 585.

[46] *Heller v. District of Columbia*, 670 F.3d 1244, 1293 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

[47] 142 S. Ct. at 2122.

Like Other regulations that burden constitutional rights, therefore, the restrictions on owning short-barreled firearms must pass *Bruen's* historical test.

The burden is on the government to prove that the restrictions imposed by the National Firearms Act are historically based. It cannot do so. The purported problems posed by short-barreled firearms have existed since the 18th century, and therefore under *Bruen*, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[48] The inquiry is "fairly straightforward"[49] and the statute is unconstitutional.

### c. *United States v. Miller* Does not require a different result.

Shortly after the passage of the National Firearms Act, in 1939 the Supreme Court decided *United States v. Miller*, upholding the Act as constitutional as applied to short-barreled shotguns.[50] The case has been criticized on numerous grounds. The Court decided the case without hearing from the defendants, whose lawyer did not submit briefing or appear for oral argument.[51] The opinion itself is "quite terse," "consists primarily of lengthy quotations and string cites," and is "anchored by a few paragraphs of crabbed analysis."[52] Instead of examining the historical records, the Court relied on "the absence of any evidence" showing that short-barreled shotguns were useful defensive weapons, and claiming that such evidence was "not within judicial notice."[53] On this

---

[48] 142 S. Ct. at 1231.

[49] *Id.*

[50] 307 U.S. 174, 178 (1939).

[51] Brian L. Frye, *The Peculiar Story of United States v. Miller*, 3 N.Y.U. J. of L. & Liberty, 48, 66-67 (2008).

[52] *Id.*

[53] *Miller*, 307 U.S. at 178.

SA_021

score, one writer concluded the opinion amounts to "ignorance, whether willful or innocent."[54] Perhaps because of these limitations, in *Heller*, the Supreme Court cautioned: "It is particularly wrongheaded to read *Miller* for more than what it said, because the case did even purport to be a thorough examination of the Second Amendment."[55]

So what, then, does *Miller* say about regulation of short-barreled rifles? In short, nothing. The facts of that case related only to short-barreled shotguns, which is a different type of weapon that is at issue here.[56] The Eleventh Circuit has "pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.[57] And by its own terms, the case turned on the characteristics of short-barreled shotguns and "the absence of any evidence" tending to show they could contribute to the common defense.[58] A different type of weapon compels a new analysis, on conducted in accordance with the *Bruen* framework.

### 4. Conclusion

Under *Bruen*, the question for the Court is whether the government has "affirmatively prove[d] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Because the statues challenged here are not part of this Nation's history and tradition, they impost unconstitutional restrictions on the Second Amendment Right to keep and bear arms.

---

[54] D'Cruz, *supra* n.15, at 503; *see also* Section 5.a., describing the historical use of short-barreled arms.

[55] *Heller*, 554 U.S. at 621.

[56] *Miller,* 307 U.S. at 178; 28 U.S.C.§ 5845 (c) (defining "rifle" and § 5845(d) (defining shotgun).

[57] *Edwards v. Prime, Inc*., 602 F.3d 1276, 1298 (11th Cir. 2010).

[58] *Miller*, 307 U.S. at 178.

SA_022

WHEREFORE, Mr. Rush respectfully requests that the Court dismiss the indictment; order

him discharged from this case; and for such further relief as the Court may deem just and proper

in the premises.


Respectfully submitted,

NEWTON BARTH, L.L.P.

By:    /s/ Talmage E. Newton IV
Talmage E. Newton IV, ARDC6305302
talmage@newtonbarth.com
555 Washington Ave., Suite 420
St. Louis, Missouri 63101
(314) 272-4490 – Telephone
(314) 762-6710 – Facsimile

*Attorney for Defendant*


## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and accurate copy of the foregoing

was served upon all counsel of record on this 26th day of September, 2022, via the Court's

electronic filing system.

*/s/ Talmage E. Newton IV*

SA_023

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **vs.** | **)** | **CRIMINAL NO. 22-CR-40008-JPG** |
| | **)** | |
| **JAMOND M. RUSH,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO DISMISS INDICTMENT

NOW COMES the United States of America, by and through its attorneys, Rachelle Aud Crowe, United States Attorney for the Southern District of Illinois, and Casey E. A. Bloodworth, Assistant United States Attorney, and respectfully submits its Response to Defendant's Motion to Dismiss Indictment and states the following in support therein:

### Background

Jamond M Rush is charged in a superseding indictment for Receipt or Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. R. 18. This charge involves an illegal weapon – an Anderson Manufacturing AR-15 rifled, having a barrel of approximately 7.5 inches – a firearm regulated by the National Firearms Act (hereinafter, "NFA"), 26 U.S.C. § 5801 *et seq*. *Id*. Rush moves to dismiss the pending superseding indictment. R. 28.

Rush submits that the first superseding Indictment must be dismissed because the statutes charging him with the offense are unconstitutional after the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). Rush's Motion should be denied because *Bruen* did not alter longstanding Supreme Court and other precedent upholding "laws prohibiting the carrying of dangerous and unusual weapons,", which are "another important

SA_024

limitation on the right to keep and carry arms." *Id.* at 2162, Alito, J., concurring), and even if the

plain text of the Second Amendment did so, § 5861(d) squarely falls within the nation's long-

standing history of firearms regulation.

### The Second Amendment, *Bruen*, and *Heller*

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be

infringed." U.S.Const. Amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008),

the Supreme Court recognized that the Second and Fourteenth Amendments protect the right of

law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-

defense.  "The Second Amendment 'is the very product of an interest balancing by the people' and

it' surely elevates above all other interests the right of law-abiding, responsible citizens to use

arms' for self-defense." *Bruen*, 142 S.Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).

"Like most rights," however, *Heller* emphasized that "the right secured by the Second

Amendment is not unlimited." *Heller*, 554 U.S. at 626. *See also Bruen*, 142 S. Ct. at 2162

(Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of

gun regulations." *Citing Heller*, 554 U.S. at 636).  The *Heller* Court in fact recognized the

importance of "the historical tradition of prohibiting the carrying of 'dangerous and unusual

weapons.'" *Id*. at 627 (citations omitted);  *see, e.g., United States v. Fincher*, 538 F.3d 868, 874

(8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes

and therefore fall within the category of dangerous and unusual weapons that the government can

prohibit for individual use.").

The Second Amendment "is neither a regulatory straitjacket nor a regulatory blank check."

*Bruen*, 142 S. Ct. at 2133. "From Blackstone through the 19th-century cases, commentators and

courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (internal quotation marks and citations omitted).  For example, the Court noted the historical tradition of prohibiting "dangerous and unusual weapons[.]" *Id.*

Thus, *Bruen* did not overturn *Heller*; instead, it "made the constitutional standard endorsed in *Heller* more explicit." *Bruen*, 142 S. Ct. at 2134.  Accordingly, the Court laid out the proper analytical framework for determining whether firearm laws are constitutional, "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.  Thus, a court must engage I a two-prong analysis.

First, the court must determine whether "the Second Amendment's plaint text covers an individual's conduct." *Id.* at 2126.  If it does not, the analysis ends, and the government's regulation is valid.  If the conduct at issue is covered by the Amendment's text, the government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*  Only if a firearm regulation is consistent with historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's protections.

The Supreme Court recognized that the government need not present a one-to-one comparison between regulations in existence in 1791 and those at issue in the current litigation. Rather, the government may demonstrate historical acceptance of a regulation by "analogy" to a similar regulation that existed in the Founding Era. *Id.* at 2132.  In this way, the test in *Bruen* only requires a showing of a historical example that is "relevantly similar" to the current regulation; the government only has to provide evidence of a "representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original).

SA_026

Applying this standard, the Court held unconstitutional a New York licensing law that allowed an applicant to obtain a license to carry a handgun outside his home only upon proving "proper cause exists." *Id*. at 2123.   First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id*. at 2134-35.   The Petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense.   Thus the Court concluded this fell within "the right to keep and bear arms." *Id*.   Compare that with the Court's approval of "shall issue" licensing regimes.   In *Bruen*, the Court approved such regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id*. at 2138 n. 9 (Nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes[.]).[1]   In doing so, the Court had no need to analyze the history of shall-issue licensing regimes. This is because these licensing regulations do not prevent law-abiding, responsible citizens from exercising their Second Amendment right. *Id*. (citation omitted).

The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early 20th centuries" to determine whether the licensing law squared with historical tradition. *Id*. at 2135-56.   After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id*. at 2156. "Apart from a few-late-19th-century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id*. The *Bruen* Court thus rejected the means-end scrutiny framework most courts had relied upon to assess the constitutionality of

---

[1] *See also Id.* at 2162 (Kavanaugh, J., joined by Roberts, C.G., concurring) ("{S}hall-issue licensing regimes are constitutionally permissible.").

gun regulations. *Id*. at 2127. But *Bruen* did not, as Rush claims, invalidate NFA laws, such as 26 U.S.C. § 5861(d).

<u>**Argument**</u>

**I.     The NFA does not forbid possession, therefore the NFA's registration and taxation requirement does not "infringe" on any right.**

As a threshold matter, the NFA does not forbid possession, therefore, the NFA does not "infringe" on any right.   The requirement of registering a short-barreled rifle is similar and analogous to other, specifically recognized, restrictions.   Recall, *Bruen* did nothing to call into question requirements that individuals in "shall-issue" jurisdictions pass a background check, or complete a firearms safety course.   In *Bruen*, the Court approved such regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id*. at 2138 n. 9 (Nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes[.]).

In doing so, the Court had no need to analyze the history of shall-issue licensing regimes. This is because these licensing regulations do not prevent law-abiding, responsible citizens from exercising their Second Amendment right. *Id*. (citation omitted).   The same is true here; the NFA does not prevent law-abiding, responsible citizens from exercising their Second Amendment right. The requirements of the NFA simply require registration of the weapon received or possessed. This is no different than other prerequisites, such as a background check or completion of a firearms safety course.   In other words, the requirement to register an NFA firearm is just a "condition" that does not violate the Second Amendment.

**II.     *Bruen* does not invalidate NFA laws.**

Rush insists that the statutes charging the offense in the First Superseding Indictment are unconstitutional under *Bruen*.   Rush's claim fails, however.

The offense falls under the NFA, 26 U.S.C. § 5801 *et seq.*, and these statutes govern

dangerous and unusual firearms (e.g., silencers, machineguns, short-barreled shotguns and rifles,

destructive devices, etc.). *See, e.g.,* 26 U.S.C. § 5845 (defining and enumerating dangerous and

unusual firearms); 26 U.S.C. § 5861 (listing prohibited acts); *See also United States v. Aiken*, 974

F.2d 446, 447 (4th Cir. 1992) (explaining that the NFA, 26 U.S.C. §§ 5801-5871, regulates certain

dangerous weapons); *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) ("Machine guns are

dangerous and unusual and therefore not in common use. They do not receive Second Amendment

protection[.]").  The District Court in the Northern District of Texas recently agreed, and found

just that.  *United States v. Holton*, 2002 WL 16701935 (N.D. Tex., Nov. 3, 2022).[2]

The *Heller* Court struck down a law prohibiting handgun possession, but in doing so noted

that the Second Amendment "only protects the right to own certain weapons, and it 'does not

protect those weapons not typically possessed by law-abiding citizens for lawful purposes.'"

*United States v. Henry*, 688 F.3d 637-639-40 (9th Cir. 2012) (quoting *Heller*, 554 U.S. at 625).

The firearms governed by the NFA are "dangerous and unusual weapons," and because they are

not common-use weapons they have no constitutional protection. *Compare United States v. Cox*,

906 F.3d 1170, 1184-86 (10th Cir. 2018) (recognizing under *Heller* that short-barreled shotguns

and rifles, machineguns, silencers, etc., have no Second Amendment protection), *with Bruen*, 142

S.Ct. at 2142 (explaining that handguns are "indisputably in 'common use' for self-defense today"

and, therefore, they are protected under the Second Amendment). In particular, the *Bruen* Court

did not overturn *Heller*, rather, it noted that its holding is "[i]n keeping with *Heller*." *Bruen*, 142

---

[2] Relying on *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) that "[i]t is….clear from the
face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes…",
and also H.R. Rep. No. 1337, 83d Cong. 2d Sess., A395 (1954) (indicating "congressional intent to cover under the
National Firearms Act only such modern and lethal weapons…as could be used readily and efficiently by criminals
and gangsters"), the *Holton* court specifically held that *Bruen* and *Heller* confirmed that such weapons are not
protected under the Second Amendment. *Bruen*, 142 S. Ct. at 2128.

SA_029

S.Ct. at 2126.  Here, Rush's constitutional challenge fails and this court does not need to consider any historical analogues.

### III.    Precedent shows that the registration regime under the NFA on short-barreled rifles does not violate the Second Amendment.

As stated above, the *Bruen* Court stated that the Second Amendment does not protect "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). That is, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. The Supreme Court has thus upheld a ban on unregistered short-barreled shotguns against a Second Amendment challenge.  *United States v. Miller,* 307 U.S. 174, 178 (1939).  The Court reaffirmed *Miller* and the propriety of banning dangerous and unusual weapons. *See Bruen,* 142 S. Ct. at 2128.[3]  Every court to address the issue has held that short-barreled rifles, which are "close analogues" of short-barreled shotguns, likewise "fall[] outside the Second Amendment guarantee." *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018).

In an unpublished opinion, the Ninth Circuit applied that precedent to short-barreled rifles and held that there was no "right to possess" them.  *Gilbert*, 286 F. App'x at 386.  The Tenth Circuit reached a similar conclusion, deeming short, barreled rifles "close analogues" of short-barreled shotguns that "fall[]outside the Second Amendment guarantee." *Cox*, 906 F.3d at 1185. The Eight Circuit too rejected a challenge to the ban on unregistered short-barreled rifles, albeit on plain-error review.  *See United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (unpublished).

---

[3] In a concurrence, Justice Alito stressed that "[o]ur holding decides nothing about who may lawfully possess a firearm" or "the kinds of weapons that people may possess" and does not "disturb[] anything that we said in *Heller* or *McDonald*. *Bruen*, 142 S. Ct. at 2157 (Alito, j., concurring).  Too, Justice Kavanaugh also reiterated that "[n]othing in our opinion should be taken to case doubt on longstanding prohibitions on the possession of firearms by felons" and reaffirmed *Miller* and the "dangerous and unusual weapon" rule. *Id*. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27).

This Court can follow the same path.  Nothing in *Bruen* points to a different conclusion.
As Justice Alito noted, the opinion "does not decide anything about the kinds of weapons that
people may possess." *Bruen*, 142 S. Ct. at 2147 (Alito, J., concurring).  The little the opinion did
say on the matter only reinforced prior precedent.  The Court reiterated that the Second
Amendment does not protect "dangerous and unusual weapons" and cited a passage from *Heller*
that quoted *Miller* as support. *Id*. at 2143.  Thus, *Bruen* is consistent with prior precedent from the
Supreme Court on this issue and with circuit-court precedent addressing short-barreled rifles.  On
this basis, Rush's challenge must fail.

## IV.    The law regulating unregistered short-barreled rifles is supported by analogous historical laws banning dangerous and unusual weapons.

Rush's argument regarding the regulation of unregistered short-barreled rifles would fail
even if the Court were to give it "fresh consideration" without looking to earlier precedent.  As
noted, at the time of the Second Amendment's ratification, regulations of dangerous and unusual
weapons were well-accepted.  *See Bruen*, 142 S. Ct. at 2150 ("The historical evidence from
antebellum American" shows that "States could lawfully eliminate one kind of public carry-
concealed carry-so long as they left open the option to carry openly); *Robertson v. Baldwin* 165
U.S. 275, 281-82 (1897) (stating in *dicta* that "the right of the people to keep and bear arms (article
2) is not infringed by laws prohibiting the carrying of concealed weapons"). Thus, short-barreled
rifles, like short-barreled shotguns, may be banned because they are dangerous and unusual
concealable weapons.

"It is of course clear from the face of the Act that the [National Firearms Act]'s object was
to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-
barreled rifles, for example, addresses a concealable weapon likely to be so used." *United States
v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); *see also Id*. at 526

(Stevens, J., dissenting) ("This statute serves the critical objective of regulating the manufacture and distribution of concealable" and "dangerous weapons." The law's history, which indicates that it was passed to address violence by targeting concealed weapons, confirms as much. *See United States v. Gonzales*, No. 10CR967-CW, 2011 WL 5288727 at *4 and n.3 (D. Utah Nov. 2, 2011) (unpublished). So does the history of amendments to the law, which indicates that short-barreled rifles "are not typically used for lawful purposes" and "are primarily weapons of war.'" *Id.* at *5 (citation omitted). In other words, "a long gun with a shortened barrel is both dangerous because 'its concealability fosters its use in illicit activity,' and unusual, 'because of its heightened capability to cause damage.'" *Cox*, 906 F.3d at 1185 (quoting *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010).

Short-barreled rifles are a far cry from common weapons like handguns, "the most popular weapon chosen by Americans for self defense in the home," in both nature and number. *Heller*, 554 U.S. at 629. Indeed, the number of common weapons like pistols, revolvers, rifles, or shotguns produced in a single year exceeds the *total* number of registered short-barreled rifles. *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2, 16 (2021).[4] Even compared to the class of dangerous and unusual weapons covered by the NFA, short-barreled shotguns are relatively uncommon. Notably, there are fewer short-barreled rifles (a little over a half a million) than destructive devices (3.3 million), machine guns (over 700,000), and silencers (2.6 million). *See Id.* at 2). There is thus ample reason to deem short-barreled rifles dangerous and unusual weapons that legislatures may ban or otherwise regulate.

---

[4] https://www.atf.org/firearms/docs/report/2021-firearms-commerce-report/download.

Exploring the historical regulations of such possession, it becomes clear that such regulations are "comparably justified." *Bruen*, 142 S. Ct. at 2133. Under English Common Law, "the offence of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 William Blackstone Commentaries *148; *See* 1 William Howkins, Please of the Crown, 135 (1716) ("[T]here may be an Affray where there is no actual Violence, as where a Man arms himself with dangerous and unusual Weapons, in such a matter as will naturally cause Terror to the People."). Following that course, courts have long acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people." *State v. Langford*, 3 Hawks 381, 383 (N.C. 1824)

The analysis of Rush's motion should end there, and his Motion should be denied. But even exploring deeper into historical sources under the second prong of the *Bruen* test, it is clear that the regulation regarding the receipt and transfer of some firearms is permissible and consistent with long-standing firearm regulations going back to the Founding Era. Federal law in fact imposes a wide range of lawful restrictions on commerce in firearms. For example, a person must obtain a federal license before engaging in the business of importing, manufacturing, or dealing in firearms. 18 U.S.C. § 922(a)(1)(A). A license-holder may not sell certain types of guns to a person who resides in a different state. *Id.* § 922(b)(3). A license-holder must also maintain records of its activities. *Id.* § 923(g). And under § 922(k), it is a crime to transport, ship, or receive a firearm with an obliterated serial number or to possess such a restricted firearm. As a textual matter, the Second Amendment demands that the right to keep and bear arms may not be "infringed" – not that the right may not be burdened in any way. The requirement to register short-barreled rifles – or dangerous or unusual weapons – stops far short of disarming law-abiding citizens. This is specifically acknowledged by Rush. R. 28, pg. 3.

Courts have recognized that 'colonial governments substantially controlled the firearms trade." *Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017).  Scholars have noted that many of the colonies enacted laws regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms.  For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals…A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'…In the 1800s, three southern states imposed taxes on personally held firearms." Robert Spitzer, *Gun Law History in the United States and the Second Amendment*, 80 Law & Contemp. Probs. 55, 76 (2017); *see also* Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision*, 46 Conn. L. Rev. 1463, 1483 (2014) ("The Founders would likely challenge the notion that the government could not register weaponry or prohibit gun ownership. Unlike modern Americans, the founding generation endured mandatory gun registration as a basis for ensuring a functional militia, and routinely disarmed those considered threatening to the establishment of social order."); *Minutes from a Convention of the Federalist Society: Civil Rights: The Heller Case*, 4 NYU J.L. & Liberty 293, 309 (2009) ("The Founders did have gun control. They had mandatory musters. Everyone with a gun had to show up and register their firearm…").

Similarly, in the early 17th century, Connecticut banned residences from selling firearms outside the colony. *Teixeira*, 8743 F.3d at 685.  Virginia likewise provided that people were at "liberty to sell arms and ammunition to any of his majesties loyal subjects *inhabiting this colony*." *Id*. at 685 n. 18 (emphasis added). And other colonies "controlled the conditions of trade" in firearms. *Id*. at 685.

Further, States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *See* Spitzer article at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and appointed a state inspector "to oversee or conduct the testing." *Id*. Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id*.

In sum, historical sources demonstrate an array of laws from the Founding Era which required firearm "registration," and which heavily regulated the transfer OF firearms – and particularly excluded sales outside the colony. These are historical analogues to the current registration requirement of short-barreled rifles – or "dangerous and unusual weapons" – which is necessary to, and in aid of, modern legislative schemes regulating the receipt and transfer of firearms.

Rush's motion does not demonstrate otherwise. To the extent he argues that the NFA's regulations were not previously employed during the Founding Era, this is a distinction without a difference. The Supreme Court itself made clear that the Second Amendment was not cabined only to firearms actually in existence in 1791; rather, the protections applied to guns in modern usage. *Heller*, 554 U.S. at 582. In this way, the modern registration requirement of "dangerous and unusual weapons" is no different than providing coverage to modern handguns (as opposed to only antique muskets). Moreover, *Bruen* has made clear that one-to-one matches are not required; the government need only show a relatively similar analogue, not a historical twin. *Bruen*, 142 S. Ct. at 2133. As the above examples of gun regulation, registration, and inspection statutes make clear, there are more than sufficient historical analogues for § 5861(d) to pass muster.

SA_035

**Conclusion**

Rush's Motion must fail because *Bruen* and prevailing precedent do not invalidate the NFA.  But even if so, the NFA's regulation of short-barreled rifles, or "dangerous and unusual weapons," is supported by analogous historical laws.

Respectfully submitted,

RACHELLE AUD CROWE
United States Attorney

**s/  Casey E. A. Bloodworth**
CASEY E. A. BLOODWORTH
Assistant United States Attorney
402 West Main Street
Benton, IL 62812
(618) 439-3808
Fax:  (618) 439-2401
E-mail: Casey.Bloodworth@usdoj.gov

SA_036

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 14, 2022, I electronically filed the Government's

<u>**RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**</u>

with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Talmage Newton
Newton Barth, L.L.P.
555 Washington Avenue
Suite 420
St. Louis, Missouri 63101


Respectfully submitted,

RACHELLE AUD CROWE
United States Attorney


<u>**s/ Casey E. A. Bloodworth**</u>
Casey E. A. Bloodworth

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.:    4:22-cr-40008-JPG |
| | ) | |
| JAMOND M. RUSH, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY TO THE GOVERNMENT'S RESPONSE REGARDING DEFENDANT'S
MOTION TO DISMISS INDICTMENT ON SECOND AMENDMENT GROUNDS**

COMES NOW Defendant Jamond M. Rush, by and through his undersigned counsel, and respectfully submits the following reply in support of his Motion to Dismiss Indictment (R. Doc. 28), which the Government has opposed (R. Doc. 38).

<u>Procedural History</u>

Mr. Rush is charged with a single count of failing to register a qualified firearm in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d). First Superseding Indictment, R. Doc. 18.

**I.    26 U.S.C. § 5861(d) regulates conduct falling within the Second Amendment's plain text.**

The text of the Second Amendment answers who has the right to keep and bear arms: "[a] well regulated Militia, being necessary to the security of a free State, the right of *the people* to keep and bear Arms, shall not be infringed. U.S. Const., amend. II (emphasis added). In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court held that regulations governing conduct falling within the Second Amendment's plain text are "presumptively" unconstitutional unless the Government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation"— that is, the tradition in existence "when the

1

Bill of Rights was adopted in 1791." *Id.* at 2119, 2130. The challenged regulation here, 26 U.S.C.

§ 5861(d), cannot survive this analysis.  The right to "keep and bear arms" includes the right to

possess a firearm—the precise conduct Mr. Rush is charged with engaging in here. Under *Bruen*,

the Second Amendment "presumptively protects [this] conduct," requiring the Government to

"affirmatively prove" that § 922(g)(1) "is part of the historical tradition that delimits the outer

bounds of the right to keep and bear arms." *Id*. at 2127.

### A.  Mr. Rush is among "the people" protected by the Second amendment.

When the Constitution uses "the people," it means citizens and members of the political

community. *District of Columbia v. Heller*, 554 U.S. 580-81, 128 S.Ct. 2783 (2008). The Second

Amendment, along with the First, Second, Fourth, Ninth, and Tenth Amendments, refers to "the

people." Within the Constitution, "the people" is a "term of art," and wherever it occurs, "the

term unambiguously refers to all members of the political community, *not an unspecified*

*subset*." *Id.*  (emphasis added); accord *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265

(1990) (The term "refers to a class of persons who are part of a national community or who have

otherwise developed sufficient connection with this country to be considered part of that

community."). The Second Amendment right—no less than the others mentioned above—

"belongs to all Americans." *Id.* at 581. The Government offers no textual argument to the

contrary—or at least no argument based on the text of the Amendment that "the people" of the

United States actually ratified through their elected representatives and delegates.

The Government suggests that the Second Amendment's protections extend only to "law

abiding, responsible citizens." *Heller* and *Bruen* did not so constrain the scope of the term "the

people." See *Heller*, 554 U.S. at 580–81 (discussing meaning of "the people"). In context, the

*Heller* Court said elsewhere in its opinion only that, "*whatever else [the Second Amendment]*

2

*leaves to future evaluation*, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635 (emphasis added). Nor did *Bruen* address the full scope of the term "the people," because it was "undisputed" in that case that the petitioners were "part of 'the people'" as "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134 (citing *Heller*, 554 U.S. at 580). Fundamentally, "[n]othing in the Second Amendment's text draws [that] distinction with respect to the right to keep and bear arms." See *Id*.

### B. The Second Amendment's Protection extends to all "bearable arms," including that which Mr. Rush is charged with possessing.

According to *Heller*, "the Second Amendment extends, prima facie, to all instruments that constitute *bearable arms*." *Id.* at 582 (emphasis added). An instrument need not have existed at the time of the founding to fall within the amendment's protection, but it must fit the founding-era definition of an "Arm[ ]." *Id.* (citing two dictionaries from the eighteenth, and one from the nineteenth, century). Then and now, that means, the Second Amendment covers "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581 (alteration in original) (citations omitted).

The Government frames the Defendant's conduct as "possess[ion of] a firearm . . . having a barrel of less than 16 inches, which was not registered to him  . . ." R. Doc. 18. *Bruen*'s first step, however, requires only that the Second Amendment's plain text cover the "conduct." The prohibited conduct under § 5861(d) is "possession of a firearm"—nothing more. "*Bruen*'s first step asks a strictly textual question with only one answer: the Second Amendment's plain text covers possession of a firearm. Because the Constitution presumptively protects possessing a firearm, § 5861's constitutionality hinges on whether regulations prohibiting a person from a

SA_040

firearm that isn't registered in the National Firearms Registration and Transfer Record align with the Nation's historical tradition of firearm regulation.

**II.      The burden has shifted to the Government to now show that 26 U.S.C. § 5861(d) is consistent with the Nation's historical tradition of firearm regulation.**

The Government must show that § 5861(d) "is consistent with the Nation's historical tradition of firearm regulation," that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Bruen,* 142 S. Ct.. at 2126. Because 922(g)(1) addresses a "general societal problem that has persisted since the 18th century, the Government must identify a "well-established and representative" tradition of statutes that are "distinctly similar." "Analogical Reasoning" is not sufficient, for the reasons described below.

**III.     The Government insists on the wrong method of historical inquiry under *Bruen*.**

*Bruen* establishes two methods of reviewing the historical evidence of firearm regulations. The proper method depends on what kind of problem a statute is meant to address. The Court explained that in "some cases," a challenged regulation "addresses a general societal problem that has persisted since the 18th century." *Id*. at 2131. For such regulations, the government must point to a robust tradition of "distinctly similar" historical regulations. *Id.* The Court then explained that in "other cases," a statute "implicat[es] unprecedented societal concerns or dramatic technological changes" or addresses a problem that was "unimaginable at the founding." *Id.* at 2132. For the latter regulations—and *only* the latter regulations—the government can use "analogical reasoning," which involves the "relevantly similar" inquiry. *Id.*

The prohibition in the National Firearms Act (hereinafter "NFA"), 26 U.S.C. § 5801 *et seq*. which regulates possession of certain "short-barreled" firearms addresses problems which have "persisted since the 18th century." The Government outlined the problems which the NFA addresses in a recent publication from the Office of Public Affairs of the Department of Jusice.

The DOJ stated that the "National Firearms Act imposes heightened regulations on short-barreled rifles because they are easily concealable, can cause great damage, and are more likely to be used to commit crimes."[1] All three of these problems have persisted since the 18th century. When the regulated problem has persisted since the 18th century,

> the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

*Bruen* 142 S. Ct. at 2131 (emphasis added).

### IV.     The Government has failed to show that 26 U.S.C. § 5861(d) is consistent with the Nation's historical tradition of firearm regulation.

The modern regulation in § 5861(d) fails *Bruen*'s first "relevant metric," because it does not "impose a comparable burden on the right of armed self-defense" to any of the historical laws cited. *Id*. at 2132-33. The burden is much more severe. The Government has identified several regulations that say nothing about the prohibition on possession of a short-barreled rifle, the kind Mr. Rush is alleged to have possessed. The Government discusses why machine guns are "dangerous and unusual," but Mr. Rush is not charged with possession of a machine gun. R. Doc. 38 at 6.  The Government also cites as "historical sources under the second prong of the *Bruen* test" 18 U.S.C. §§ 922(a)(1)(A), 922(b)(3), 923(g), and 922(k), none of which were remotely enacted or contemplated during the 18th century. *Id*. at 10. For that very reason, a district court in West Virginia recently declared § 922(k) as unconstitutional, quoting *Bruen*:

> "[h]istorical evidence that long predates [the ratification] ... may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Bruen,* 142 S. Ct. at 2136. Likewise, the Court cautions that lower courts "must also guard

---

[1] Press Release, DOJ, Justice Department Issues Proposed Rule and Model Legislation to Reduce Gun Violence (June 7, 2021),  https://www.justice.gov/opa/pr/justice-department-issues-proposed-rule-and-model-legislation-reduce-gun-violence (last accessed 12/12/2021).

SA_042

against giving postenactment history more weight than it can rightly bear," by only considering those postenactment sources that help "determine *the public understanding* of [the Second Amendment]" at the time of its ratification. *Id.* (emphasis and alteration in original) (citation omitted).

*United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *3 (S.D.W. Va. Oct. 12, 2022). The Government next cites to several journal articles to support their contention that some colonial laws were enacted "regarding the registration of firearms as part of the legislative schemes regarding the sale, transfer, and taxation of firearms." R. Doc. 38, at 11. The Government then discusses selling firearms, transferring firearms, taxing firearms, and finally, registering firearms—as part of a "mandatory muster[] scheme," to "ensur[e] a functional militia." *Id*. The Government does not quote the text of or cite to a single law from the relevant time period supporting any historical traditions of prohibiting or of regulating short-barreled rifles, or of requiring the registry of short-barreled rifles, or of punishing those who possessed them. None of the Government's examples come close to the satisfying the *Bruen* test. In fact, the Government has not even shown that short-barreled rifles were not in common use at the time, for the purpose of self-defense, because of course, they were. Every American schoolchild has seen images of a "blunderbuss," a short-barreled rifle that was possessed by Colonial Americans in the 1700s.

The Supreme Court's second "relevant metric," is "whether that regulatory burden is comparably justified." But in this case, because the Government *has not provided any distinctly similar or relevantly similar examples* of a historical example or analogue of a "comparable burden" to the regulation in § 5861(d), it cannot jump forward to the question of whether that burden is "comparably justified." Courts "should not "uphold every modern law that remotely resembles a historical analogue," because doing so" risk[s] endorsing outliers that our ancestors would never have accepted." *Bruen*, 142 S. Ct. at 2133 (quoting *Drummond v. Robinson*, 9 F.4th

SA_043

217, 226 (CA3 2021). The Government has not proffered a single analogous restriction even remotely comparable to § 5861(d) which would have been acceptable to our American ancestors in the years close to 1791.

As the district court in west Texas recently stated while striking down § 922(g)(8), a "strict reading of *Bruen*—which instructs that "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment"—would seemingly bar this Court from analyzing further." *United States v. Litsson Antonio Perez-Gallan*, No: 4:2022cr00427 at 16 (W.D. Tex. Nov. 10, 2022). Because the Government has failed to carry its burden, this Court's task is "fairly straightforward": it should strike down § 922(g)(8) as facially unconstitutional. *Bruen*, 142 S. Ct. at 2131.

### Conclusion

WHEREFORE, for the foregoing reasons, the Defendant requests that the Court grant his Motion to Dismiss Indictment, order him discharged from this case, and for such further relief as the Court may deem just and proper in the premises.

Respectfully submitted,

**NEWTON BARTH, L.L.P.**

By:     */s/ Talmage E. Newton IV*
Talmage E. Newton IV, ARDC6305302
tnewton@newtonbarth.com
555 Washington Ave., Suite 420
St. Louis, Missouri 63101
(314) 272-4490 – Telephone
(314) 762-6710 – Facsimile

*Attorney for Defendant*

7

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that a true and accurate copy of the foregoing

was served upon all counsel of record on this 19th day of December, 2022, via the Court's

electronic filing system.

*/s/ Talmage E. Newton IV*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

Plaintiff,

v.

JAMOND M. RUSH,

Defendant.

Case No. 22-cr-40008-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Jamond M. Rush's motion to dismiss the First Superseding Indictment in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 211 (2022) (Doc. 28).  The Government has responded to the motion (Doc. 38), and Rush has replied to that response (Doc. 43).

I.   **Background**

On April 5, 2022, the grand jury returned an indictment charging Rush with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and seeking forfeiture of the firearm (an AR-15 rifle) and ammunition involved in his alleged offense (Doc. 1).  On August 16, 2022, the grand jury returned the First Superseding Indictment changing the charge to receiving or possessing an unregistered short-barreled rifle in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871, and seeking forfeiture of the same firearm and ammunition sought in the original indictment (Doc. 18).  The relevant part of the National Firearms Act ("NFA") states, "It shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."  26 U.S.C. § 5861(d).

On September 26, 2022, Rush asked the Court to dismiss the First Superseding Indictment on the grounds that the statute requiring him to register his short-barreled rifle in the National Firearms Registration and Transfer Records, 26 U.S.C. § 5861(d), unduly burdens his core Second Amendment

right to keep and bear arms for self-defense.  In support, he points to the Supreme Court's recent

decision in *Bruen*.

In response, the Government contends that the possession of short-barreled rifles is not protected

by the Second Amendment because such a weapon is a "dangerous and unusual weapon" not commonly

possessed for self-defense.  Furthermore, it argues there is a historical tradition regulating the concealed

carrying of dangerous and unusual weapons, including weapons like short-barreled rifles.

## II.   Analysis

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a

free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

In the past fifteen years, the Supreme Court has made landmark rulings about the Second Amendment's

meaning and application.

The first of these cases, *District of Columbia v. Heller*, 554 U.S. 570 (2008), was decided after

decades without any major Supreme Court decisions considering the Second Amendment.  It rejected

the understanding that the amendment applied only to arms for militia service.

In *Heller*, the Supreme Court considered a District of Columbia prohibition on, among other

things, possessing a handgun in the home.  *Id.* at 574-75.  It concluded that the Second Amendment right

to keep and bear arms is not confined to the context of militia service but instead extends to an

individual's right to possess and carry weapons for self-defense in case of confrontation.  *Id.* at 595.

Nevertheless, it acknowledged that the right is not limitless; the Second Amendment does not "protect

the right of citizens to carry arms for *any sort* of confrontation."  *Id.* (emphasis in original).  Indeed,

historically "the right was not a right to keep and carry any weapon whatsoever in any manner

whatsoever and for whatever purpose."  *Id.* at 626 (citing prohibitions on carrying concealed weapons,

possession by felons and the mentally ill, carrying in sensitive places, or conditions and qualifications

for commercial sales); *accord New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128

(2022); *McDonald v. City of Chi.*, 561 U.S. 742, 786 (2010).

For example, *Heller* cites *United States v. Miller,* 307 U.S. 174 (1939), for the proposition that certain *types* of weapons are, because of their nature, not covered by the Second Amendment.  *Heller*, 554 U.S. at 622.  In *Miller*, the weapon at issue was a short-barreled shotgun, which the *Miller* Court observed was not, at the time the Bill of Rights was adopted, "part of the ordinary military equipment" and could not "contribute the to the common defense."  *Miller*, 307 U.S. at 178.

*Heller* drew from the *Miller* decision that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  *Heller*, 554 U.S. at 624-25.  On the contrary, the Second Amendment covers only arms "of the kind in common use at the time" that a citizen would have been expected to bring with him when called for militia service.  *Id.* at 627.  The Supreme Court concluded that such an understanding "accords with the historical understanding of the scope of the right," *id.* at 625, and "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *id.* at 627.  *Heller* concluded that the District of Columbia's ban on handguns—the overwhelming public choice for self-defense—held and used for self-defense in the home violated the Second Amendment.  *Id.* at 628-29, 635.

There is no reason the exclusion from Second Amendment protection of "dangerous and unusual firearms" should not apply as well to short-barreled rifles, the weapon at issue in this case, as well as short-barreled shotguns, the weapon in *Miller*.  *Bruen* did not change this.

The Supreme Court in *Bruen* considered a New York regulation requiring an applicant for a license to carry a firearm in public to have a heightened need for self-protection.  The *Bruen* Court started by quickly agreeing that the Second Amendment "right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" extended to carrying handguns for self-defense in public, outside the home.  *Bruen*, 142 S. Ct. at 2135.  It found no fault with non-discretionary licensing

3

schemes to exercise the public carry right based on objective criteria, but condemned New York's

additional requirement that a public carry license applicant demonstrate "proper cause," that is, a

"special need for self-protection distinguishable from that of the general community."  *Id.* at 2123.[1]

New York justified the "proper cause" requirement as "substantially related to the achievement of an

important government interest," preventing handgun violence primarily in urban areas.  *Id.* at 2125,

2131.

      In determining that the "proper cause" requirement infringed on public carry applicants' Second

Amendment rights, applied to the states under the Fourteenth Amendment, the Supreme Court held that

the constitutionality of a firearm regulation depends solely on whether the restriction is consistent with

"the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.* at 2127.

There is no "interest balancing" or "means-end scrutiny" inquiry in this determination.  *Id.*  When a

regulation limits conduct covered by the Second Amendment, the Government "must affirmatively

prove" that the regulation is part of the historical tradition, or the regulation is unconstitutional.  *Id.* at

2127, 2129-30.  Thus, the two—and only—relevant inquiries are (1) does the Second Amendment's

plain text cover the regulated conduct and (2) is the regulation consistent with the country's historical

tradition.  *Id.* at 2126.  If the regulated conduct is covered, it is presumed that the Constitution protects

that conduct, and if there is no historical tradition of regulating that conduct, the regulation is

unconstitutional.  *Id.* at 2129-30.

      As noted above, the *Bruen* Court found the right to carry in public for self-defense fell within the

plain text of the Second Amendment, satisfying the first relevant inquiry.  *Id.* at 2134-35.  Moving on to

the second, the *Bruen* Court concluded that the "proper cause" requirement for receiving a public carry

license from New York was not within the nation's historical tradition.  *Id.* at 2156.  Although "the right

---

[1] Restricted licenses were available for non-self-defense uses such as hunting, target-shooting, or employment.  *Id.* at 2123.

to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms," the *Bruen* Court found no "tradition of broadly prohibiting the public carry of commonly used firearms for self-defense," and no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* at 2138, 2156. Therefore, the "proper cause" requirement was unconstitutional. *Id.*

   *Bruen* had no impact on the constitutionality of regulating the receipt or possession an unregistered short-barreled rifle. While it eliminated the "interest balancing" or "means-end" tests that some Courts of Appeals had created after *Heller*, it confirmed that the critical inquiry is solely whether the restriction in issue is consistent with Second Amendment's text and historical understanding. *Id.* at 2131.

   Rush's alleged conduct is not covered by the plain text or the historical understanding of the Second Amendment. *See United States v. Holton*, No. 3:21-CR-0482-B, 2022 WL 16701935, at *4 (N.D. Tex. Nov. 3, 2022). *Heller* assures that keeping and bearing "dangerous and unusual firearms"— like short-barreled shotguns or rifles or other weapons not typically possessed by law-abiding citizens for lawful purposes—are outside the bounds of Second Amendment protection because such weapons are not in common use by law-abiding citizens for self-defense. Indeed, by enacting the NFA, the statute under which Rush is charged, Congress took aim at "certain weapons *likely to be used for criminal purposes*, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used," not weapons typically used by law-abiding citizens for self-defense. *See United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (emphasis added). Far from overruling this part of *Heller*, *Bruen* confirmed that the Second Amendment protects only weapons in common use by law-abiding citizens for self-defense. Thus, regulating the receipt or possession of "dangerous and unusual firearms" like short-barreled rifles does not fall within the Second Amendment.

5

The Court cannot ignore *Heller*'s clear statement on this point.[2]

Consequently, the offense with which Rush is charged does not infringe on his constitutional right to keep and bear arms as recognized under the Second Amendment, and the Court must deny his motion to dismiss the indictment.

**III.     Conclusion**

For the foregoing reasons, the Court **DENIES** Rush's motion to dismiss the First Superseding Indictment (Doc. 28).

**IT IS SO ORDERED.**
**DATED:  January 25, 2023**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

---

[2] The Court need not reach Rush's argument that short-barreled shotguns and rifles *are* commonly used for self-defense.  This argument runs smack into *Heller*'s finding that they are not, and Congress's decision to regulate them under the NFA precisely because they are not.

6

**SA_051**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.  22-CR-40008-JPG |
| | ) | |
| JAMOND M. RUSH, | ) | |
| | ) | |
| Defendant. | ) | |

## **PLEA AGREEMENT**

The attorney for the United States and the attorney for the Defendant have engaged in discussions and have reached an agreement, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B).  The terms are as follows:

### I.   **Charges, Penalties, and Elements**

1.   Defendant understands the charge contained in the First Superseding Indictment and will plead guilty to Count 1.   Defendant understands the essential elements of these counts and the possible penalties, as set forth below:

| Count | Charge | Statutory Penalties | Essential Elements |
|---|---|---|---|
| 1 | Receipt or Possession of an Unregistered Firearm<br><br>26 U.S.C. §5841, 5861(d), and 5871 | **Imprisonment:** Not more than 10 years' imprisonment<br>**Fine:** Up to $10,000.00 fine<br>**Supervised Release:** Not more than 3 years' supervised release<br>**Special Assessment:** $100.00 | 1. The defendant knowingly possessed a firearm as defined in 26 U.S.C. § 5845; and<br>2. The firearm was a rifle having a barrel of less than 16 inches; and<br>3. The defendant knew of the characteristics of the firearm; and<br>4. The firearm was in, or could have readily been put in operating condition; and<br>5. The firearm was not registered to the defendant in the National Firearms Registration and Transfer Record. |

Defendant committed acts that satisfy each of the essential elements listed above.

2.      Title 18, United States Code, Section 3013 requires the Court to assess a $100 "special assessment" per felony count. Defendant understands that the special assessment will be due immediately at the time of sentencing.

3.      Defendant understands that the United States may recommend, and the Court may impose, a fine, costs of incarceration, and costs of supervision. The Defendant agrees to participate in the Inmate Financial Responsibility Program to help satisfy any financial obligations.

4.      Defendant shall provide the United States Probation Office with all information requested to prepare the Presentence Report, including signing all releases. Defendant agrees that the Probation Office may share any financial information with the United States Attorney's Office and Defendant waives any rights Defendant may have under the Right to Financial Privacy Act.  Defendant agrees to make complete financial disclosure by truthfully filling out a financial statement, at the direction of the United States Attorney's Office. Defendant also expressly authorizes the United States Attorney's Office to obtain Defendant's credit report on or after the date of this agreement.

## II. Advisory Sentencing Guidelines

1.      Defendant understands that in determining the sentence, the Court is obligated to consider the minimum and maximum penalties allowed by law. In determining what sentence to impose, the Court will also calculate and consider the applicable range under the U.S. Sentencing Guidelines. The Court will ultimately determine the sentence after hearing the arguments of the parties and considering the sentencing factors set forth at 18 U.S.C. §3553(a), which include:

> (i)      the nature and circumstances of the offense and the history and characteristics of the defendant;

SA_053

(ii)   the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(iii)  the kinds of sentences available;

(iv)   the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(v)    the need to provide restitution to any victim of the offense.

2.      Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the Court is not bound by the parties' calculations of the US Sentencing Guidelines range set forth in this Plea Agreement or by the parties' sentencing recommendations. Therefore, the Court may impose a different sentence than what is described in this Plea Agreement - anywhere between the minimum sentence (if any) up to the statutory maximum sentence. If the Court imposes a different sentence than what is described in this Plea Agreement, the parties shall not be permitted to withdraw from the Plea Agreement and the Defendant will not be permitted to withdraw the guilty plea.

3.      The United States and Defendant submit that, after all factors have been considered, Defendant will have the following advisory US Sentencing Guideline range:

> Offense Level 15,
> Criminal History Category of III (see paragraph 6 of this Section),
> Imprisonment range of 24-30 months',
> Fine range of $7,500-$10,000.

4.      The parties submit that the applicable advisory Guideline calculation is as follows:

SA_054

| Guideline Section | Description | Level |
|---|---|---|
| Chapter 2 Offense Conduct | | |
| §2K2.1(a)(5) | Base Offense Level – 18 | 18 |
| | TOTAL OFFENSE LEVEL | 18 |
| §3E1.1 | Acceptance of Responsibility | (-3) |
| | | |
| | **OFFENSE LEVEL:** | **15** |

5.      Defendant and the Government agree that Defendant has voluntarily demonstrated a recognition and affirmative acceptance of personal responsibility for this criminal conduct, and the Government will recommend a reduction of **2** Levels. See U.S.S.G. § 3E1.1. The parties also agree that the Defendant qualifies for an additional **1** Level reduction by timely notifying authorities of an intention to plead guilty thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently. However, a reduction for acceptance of responsibility is dependent on Defendant not committing any acts or taking any position prior to sentencing inconsistent with acceptance of responsibility, including falsely denying, or frivolously contesting, relevant conduct or committing any acts constituting obstruction of justice.

6.      The United States submits that it appears that Defendant has amassed **(4) Criminal History points** and that, therefore, the government believes the Sentencing Guideline **Criminal History Category is III**.  Defendant believes that his criminal history category may possibly be less than Category III.  The parties acknowledge that the Defendant is in the best position to know if his criminal history information is correct and complete. If it is not, the sentencing calculations reflected in this Plea Agreement may be substantially impacted. Defendant further recognizes that the final calculation will be determined by the Court after considering the Presentence Report, the views of the parties, and any evidence submitted.

SA_055

Regardless of the criminal history found by the Court, the parties will not be able to withdraw from this plea agreement and the Defendant will not be able to withdraw the guilty plea.

7.      The parties reserve the right to argue for, present testimony, or otherwise support the Probation Office's or the Court's findings as to Offense Level and Criminal History Category, which may be different from the calculations set forth in this Plea Agreement.

### III. Sentencing Recommendations

1.      The United States and Defendant are not in agreement as to the appropriate sentence. The parties will address the sentencing factors set forth in 18 U.S.C. §3553(a) and may recommend any sentence allowable by law.

### IV. Limitation of Plea Agreement & Breach of the Agreement

1.      All agreements between the parties are written and no other promises, inducements, representations, or threats were made to induce Defendant to enter into the Plea Agreement and Stipulation of Facts.  Defendant agrees that this Plea Agreement, the Stipulation of Facts, and any supplements, make up the entire agreement between the United States and Defendant and supersedes any other agreement, oral or written. The terms of this Plea Agreement can be modified only in writing signed by all of the parties.

2.      The United States will file a sealed supplement to this plea agreement, as required in every case in the Southern District of Illinois. That supplement may, or may not, include additional terms. If additional terms are included in the supplement, they are incorporated and made a part of this Plea Agreement.

3.      Defendant understands and acknowledges that the Plea Agreement is limited to the Southern District of Illinois, and cannot bind other federal, state or local prosecuting authorities.  Defendant further understands and acknowledges that the Plea Agreement does not

SA_056

prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil proceedings directly or indirectly involving Defendant.

4.      If the Defendant commits any violation of local, state or federal law (other than a petty traffic offense), violates any condition of release, violates or fails to perform any term of this Plea Agreement, provides misleading, incomplete, or untruthful information to the U.S. Probation Office, or fails to appear for sentencing, the United States, at its option, may ask the Court to be released from its obligations under this Plea Agreement. The United States may also, in its sole discretion, proceed with this Plea Agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility. No action taken or recommendation made by the Government pursuant to this paragraph shall be grounds for the Defendant to withdraw the guilty plea.

5.      Defendant agrees that in the event the Defendant materially breaches this Plea Agreement, or Defendant is permitted to withdraw Defendant's guilty plea(s), that any and all statements made by Defendant, whether under oath or not, at the change of plea hearing, and any evidence derived from such statements, are admissible against Defendant in any prosecution of or action against Defendant. Defendant knowingly and voluntarily waives any argument under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from any statements should be suppressed or are inadmissible.

## V. **Defendant's Waiver of Rights, Consequences of Plea of Guilty, and Appeal Waiver**

1.      The Defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. Defendant's counsel has explained the waivers of rights, and the consequences of those waivers, that are

SA_057

contained in this Plea Agreement.  Defendant fully understands that, as a result of the guilty plea,

no trial will occur and that the only action remaining to be taken in this case is the imposition of

the sentence.

2.      By pleading guilty, Defendant fully understands that Defendant is waiving the

following rights:  the right to plead not guilty to the charges; the right to be tried by a jury in a

public and speedy trial; the right to file pretrial motions, including motions to suppress or

exclude evidence; the right at such trial to a presumption of innocence; the right to require the

United States to prove the elements of the offenses charged against Defendant beyond a

reasonable doubt; the right not to testify; the right not to present any evidence; the right to be

protected from compelled self-incrimination; the right at trial to confront and cross-examine

adverse witnesses; the right to testify and present evidence; and the right to compel the

attendance of witnesses.

3.      **Release Pending Sentencing:** The Defendant acknowledges that Title 18, United

States Code, Section 3143(a)(1) requires that upon a plea of guilty in this case, the Court must

order the Defendant detained pending sentencing, unless the Court finds by clear and convincing

evidence that the Defendant is not likely to flee or pose a danger to the safety of any other person

or the community if admitted to bond, pursuant to Title 18, United States Code, §3142(b) or (c).

United States and the Defendant agree that Defendant should be detained pending sentencing as

there is no clear and convincing evidence that Defendant is not likely to flee or pose a danger to

the safety of another person or the community if admitted to bond.

4.      Defendant understands that by pleading guilty, Defendant is waiving all appellate

issues that might have been available if Defendant had exercised the right to trial.

SA_058

5.      Defendant is aware that Title 18, Title 28, and other provisions of the United

States Code afford every defendant limited rights to contest a conviction and/or sentence through

appeal or collateral attack.  However, in exchange for the recommendations and concessions

made by the United States in this Plea Agreement, **Defendant knowingly and voluntarily**

**waives the right to seek modification of, or contest any aspect of, the conviction or sentence**

**in any type of proceeding,** including the manner in which the sentence was determined or

imposed, that could be contested under Title 18 or Title 28, or under any other provision of

federal law. Defendant's waiver of the right to appeal or bring collateral attacks includes

contesting: 1) the constitutionality of the statute(s) to which Defendant is pleading guilty or

under which Defendant is sentenced; and 2) that the conduct to which Defendant has admitted

does not fall within the scope of such statute(s).

6.      **Exceptions to the waiver of the right to appeal or bring a collateral attack:**

a.   If the sentence imposed is in excess of the Sentencing Guidelines as

determined by the Court (or any applicable statutory minimum, whichever is

greater), Defendant reserves the right to appeal the substantive reasonableness

of the term of imprisonment.  Defendant acknowledges that in the event such

an appeal is taken, the United States reserves the right to fully and completely

defend the sentence imposed, including any and all factual and legal findings

supporting the sentence, even if the sentence imposed is more severe than that

recommended by the United States.

b.   The defendant's waiver of the right to appeal or bring a collateral attack does

not apply to a claim that Defendant received ineffective assistance of counsel.

SA_059

c.  The Government agrees that it will not assert that Defendant's waiver of the right to seek modification of the sentence imposed precludes Defendant from filing a motion for compassionate release pursuant to 18 U.S.C. 3582(c)(2). *See United States v. Bridgewater,* 995 F.3d 591 (7th Cir. 2021).  In exchange, Defendant agrees to the following limitations on Defendant's right to seek such relief from the Court:

1. Until the United States Sentencing Commission amends U.S.S.G. § 1B1.13 as it exists on the date of this agreement, Defendant may seek compassionate release only to the extent and upon the bases allowable under § 1B1.13 and its Application Notes 1(A) – (C), 2, and 3 defining extraordinary and compelling circumstances, except that the motion need not be initiated by the Director of the Bureau of Prisons.

2. After the Sentencing Commission amends § 1B1.13, Defendant may seek compassionate release only to the extent and upon the bases allowable by § 1B1.13 and its Application Notes as they exist at the time Defendant's motion is filed.

3. Defendant may not assert in a successive motion for compassionate release any ground which was asserted in a prior motion under § 3582(c)(2) as a basis for relief where the prior motion was denied on its merits.

d.  The Defendant's waiver of appeal and collateral attack rights do not apply to whether the District Court erred in denying Defendant's Motion to Dismiss Indictment, said Order filed at Doc. 46.

SA_060

The United States reserves the right to oppose any such claim for relief. The parties agree that the Defendant is waiving all appeal and collateral attack rights, except those specified in this paragraph of the Plea Agreement.

7.      Except as expressly permitted in the preceding paragraph, Defendant acknowledges that any other appeal or collateral attack may be considered a material breach of this Plea Agreement and the United States reserves the right to take any action it deems appropriate, including having a court declare that Defendant has materially breached this Plea Agreement.

8.      Defendant's waiver of appeal and collateral review rights shall not affect the United States' right to appeal Defendant's sentence pursuant to Title 18, United States Code, Section 3742(b). This is because United States Attorneys lack any right to control appeals by the United States, through plea agreements or otherwise; that right belongs to the Solicitor General. 28 C.F.R. § 0.20(b).

9.      Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any Department or Agency of the United States, or unit of state government, any records pertaining to the investigation or prosecution of this case, including without limitation, any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act of 1974, Title 5, United States Code, Section 552a, or the Illinois Freedom of Information Act (5 ILCS 140) or the Illinois Open Meetings Act (5 ILCS 120).

10.     Defendant waives all civil claims against the United States or any official working on behalf of the United States during the investigation or prosecution of this matter.

SA_061

## VI. <u>Agreement to Forfeit Assets</u>

Defendant agrees to forfeit to the United States immediately and voluntarily any firearms and ammunition which are subject to forfeiture pursuant to Title 26, United States Code, Section 5872 and Title 28, United States Code, Section 2461(c). Said items to be forfeited include the following:

1.      An Anderson Manufacturing AR-15 rifle, bearing serial number 20318514; and

2.      Any and all ammunition seized therewith.

All assets to be forfeited include property used or intended to be used to facilitate the commission of the offense for which Defendant is pleading guilty, as well as any and all property constituting proceeds from said offense.

The Court finds that said items are forfeitable; however, the United States may, at its discretion, proceed with the destruction of said items without completing the forfeiture process against same.

The United States may abandon forfeiture of any of the items by filing notice of the same with the Court.

Defendant agrees to forfeit all interests in the properties as described above and to take whatever steps are necessary to pass clear title to the United States. These steps include but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, the signing of any other documents necessary to effectuate such transfers, and the execution of withdrawals of any claims or defenses which may have previously been asserted against the forfeiture of any of the property. Defendant further authorizes his attorney, Talmage E. Newton, IV, to execute on Defendant's behalf any documents requested by the Government to effectuate the forfeitures.

Defendant agrees to consent to any civil or administrative forfeiture brought against the property described above pursuant to Title 21, United States Code, § 881. Defendant waives service of process or notice in any such civil or administrative proceeding and agrees that an order for forfeiture may be entered in said civil or administrative proceeding without further notice or hearing.

If requested by the Government, all steps necessary to locate property and to pass title to the United States shall be completed before Defendant's sentencing.

Defendant agrees that forfeiture of Defendant's assets shall not be treated as satisfaction of any fine, restitution, costs of imprisonment, or any other penalty this Court may impose upon Defendant in addition to forfeiture.

## VII.  Collateral Consequences of Conviction

1.      Defendant understands that Defendant is pleading guilty to a felony punishable by a term of imprisonment exceeding one year.  Therefore, no matter what sentence the Court imposes (whether probation or any term of imprisonment), Defendant will be forbidden by federal firearms laws from possessing any type of firearm in Defendant's lifetime, unless Defendant obtains relief pursuant to 18 U.S.C. § 925, or other appropriate federal statute.

2.      Defendant acknowledges that other collateral consequences are possible.

## VIII.   Defendant's Acknowledgements

1.      Defendant is fully satisfied with the representation received from defense counsel. Defendant has reviewed the United States' evidence and has discussed the United States' case, possible defenses and defense witnesses with defense counsel.  Defendant's attorney has completely and satisfactorily explored all areas which Defendant has requested relative to the United States' case and possible defenses.  Defendant acknowledges having had adequate

SA_063

opportunity to discuss the potential consequences of the guilty plea with defense counsel.

Defendant has had all of Defendant's questions answered by defense counsel.  Defendant agrees

that this Plea Agreement is not the result of any threats, duress or coercion.  Defendant enters

this guilty plea freely, voluntarily, and knowingly, because Defendant is in fact guilty.

      2.      By signing this Plea Agreement, Defendant certifies having read it (or that it has

been read to Defendant in a language that Defendant understands), Defendant has discussed the

terms of this Plea Agreement with defense counsel and fully understands its meaning and effect.

**IX.**

No additional matters are in dispute.

UNITED STATES OF AMERICA,

RACHELLE AUD CROWE
United States Attorney

JAMOND M. RUSH
Defendant

CASEY E. A. BLOODWORTH
Assistant United States Attorney

TALMAGE E. NEWTON, IV
Attorney for Defendant

Date: ___May 4, 2023___

Date: ___April 26, 2023___

SA_064

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.:    4:22-cr-40008-JPG |
| | ) | |
| JAMOND M. RUSH, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>NOTICE OF APPEAL</u>

COMES NOW Defendant Jamond M. Rush, by and through his undersigned counsel, and hereby gives notice that he intends to appeal to the United States Court of Appeals for the Seventh Circuit seeking review of his conviction and the judgment entered in this action on November 21, 2023. Defendant requests that the Clerk of the Court initiate the appeal process on his behalf.

Defendant appears before this court as an indigent litigant and counsel was appointed pursuant to the Criminal Justice Act.

Respectfully submitted,

NEWTON BARTH, L.L.P.

By:    */s/ Talmage E. Newton IV*
Talmage E. Newton IV, ARDC6305302
talmage@newtonbarth.com
555 Washington Ave., Suite 420
St. Louis, Missouri 63101
(314) 272-4490 – Telephone
(314) 762-6710 – Facsimile

*Attorney for Defendant*

1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that a true and accurate copy of the foregoing was served upon all counsel of record on this 21st day of November, 2023, via the Court's electronic filing system.

<u>/s/ Talmage E. Newton IV</u>

**SA_066**