No. 23-3256

IN THE

# United States Court of Appeals

FOR THE SEVENTH CIRCUIT

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

### JAMOND M. RUSH,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Illinois, No. 4:22-CR-40008-JPG-1
The Honorable J. Phil Gilbert, District Judge

# BRIEF FOR APPELLEE UNITED STATES

RACHELLE AUD CROWE
  *United States Attorney*

THOMAS E. LEGGANS
  *Assistant United States Attorney*
  *Office of the United States Attorney*
  *402 West Main Street – Suite 2A*
  *Benton, Illinois 62812*
  *(618) 439-3808*

No. 23-3256

IN THE

# United States Court of Appeals

FOR THE SEVENTH CIRCUIT

_____

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

v.

**JAMOND M. RUSH,**

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of Illinois, No. 4:22-CR-40008-JPG-1
The Honorable J. Phil Gilbert, District Judge

_____

# BRIEF FOR APPELLEE UNITED STATES

_____

RACHELLE AUD CROWE
  *United States Attorney*

THOMAS E. LEGGANS
  *Assistant United States Attorney*
  *Office of the United States Attorney*
  *402 West Main Street – Suite 2A*
  *Benton, Illinois 62812*
  *(618) 439-3808*

# TABLE OF CONTENTS

Table of Contents....................................................................................................... ii

Table of Authorities ................................................................................................iv

Jurisdictional Statement ..........................................................................................1

Statement of the Issue...............................................................................................2

Statement of the Case ..............................................................................................3

Summary of Argument .............................................................................................4

Argument(s)……………………………………………………………………...5

I.     The Supreme Court Upheld the Constitutionality of the NFA in United States v. Miller, 307 U.S. 174, 178 (1939) and that Decision Remains Binding on this Court…………………………………………………………………….6

II.    If this Court is Inclined to Engage in an Advisory Analysis of the Issues in this Case based upon the Bruen Opinion, that Analysis Should Conclude that § 5861(d) is Constitutional Post-Bruen…………………………………………..10

A. Rush's Conduct is Not Covered by The Plain Text of the Second Amendment…………………………………………………………………..12

1. A Short-barreled Rifle is not an "Arm" that the Second Amendment Protects…………………………………………………………...…..12

2. Laws Requiring Registration of Short-Barreled Weapons do not "Infringe" on Second Amendment Rights…………………………………………..22

B. Even if Short-Barreled Weapons are "Arms" and even if the NFA's Regulatory Scheme Constitutes an "Infringement," there is a Historical Tradition Supporting the Regulation of Short-Barreled Weapons………………………..27

1. There are Colonial Era and Revolutionary War Era Laws Regulating the Barrell Length of Firearms for Militia Members that Constitute Historical "Twins" to the NFA…………………………………………………………..28

2.  There are Historical Analogues to the Regulations in the NFA................31

Conclusion ......................................................................................................... 36

Certificate of Compliance.................................................................................. 38

Certificate of Service.......................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*Atkinson v. Garland*,
  70 F.4th 1018 (7th Cir. 2023)............................................................................12

*Bailey v. Drexel Furniture Co.* (*The Child Labor Tax Case*),
  259 U.S. 20 (1922) ........................................................................................25

*Bevis v. City of Naperville, Illinois*,
  85 F.4th 1175 (7th Cir. 2023)....................................................................passim

*Caetano v. Massachusetts*,
  577 U.S. 411, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016)................................15, 20

*Clark v. Community for Creative Non-Violence*,
  468 U.S. 288 (1984)........................................................................................11

*D.C. v. Heller*,
  554 U.S. 570, 628 (2008) ..........................................................................passim

*Drummond v. Robinson*,
  9 F.4th 217 (3d Cir. 2021)..............................................................................28

*Edwards v. Prime, Inc.*,
  602 F.3d 1276 (11th Cir. 2010) ........................................................................8

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015)................................................................17, 18, 19

*Haynes v. United States*,
  390 U.S. 85 (1968) ........................................................................................34

*Herrera v. Raoul,*
670 F. Supp. 3d 665 (N.D. Ill. 2023) ........................................................ 32, 33

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ............................................................................ passim

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
597 U.S. 1 (2022) ............................................................................... passim

*Reynolds v. Middleton,*
779 F.3d 222 (4th Cir. 2015) ............................................................... 11

*Robertson v. Baldwin,*
165 U.S. 275 (1897) ............................................................................ 35

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
490 U.S. 477 (1989) ........................................................................... 6, 9

*Sonzinsky v. United States,*
300 U.S. 506 (1937) ............................................................................ 24

*State v. Langford,*
3 Hawks 381 ..................................................................................... 35

*Teixeira v. City of Alameda,*
873 F.3d 670 (9th Cir. 2017) ............................................................... 31, 32

*United States v. Amos,*
501 F.3d 524 (6th Cir. 2007) ............................................................... 21

*United States v. Billups,*
536 F.3d 574 (7th Cir. 2008) ............................................................... 6

*United States v. Brown,*
　548 F.2d 204 (7th Cir.1977)...............................................................26

*United States v. Cote,*
　504 F.3d 682 (7th Cir. 2007)...............................................................6

*United States v. Cox,*
　906 F.3d 1170 (10th Cir. 2018)................................................passim

*United States v. Freed,*
　401 U.S. 601 (1971)...........................................................................26

*United States v. Gilbert,*
　286 F. App'x 383 (9th Cir. 2008).......................................................10

*United States v. Gresham,*
　118 F.3d 258 (5th Cir.1997)...............................................................26

*United States v. Henry,*
　688 F.3d (9th Cir. 2012)......................................................................21

*United States v. Holton,*
　639 F.Supp.3d 704 (N.D. Tex. Nov. 3, 2022)...................................33

*United States v. Khatib,*
　706 F.2d 213 (7th Cir.1983)...............................................................26

*United States v. Lim,*
　444 F.3d 910 (7th Cir. 2006).......................................................23, 25

*United States v. Majid,*
　No. 4:10CR303, 2010 WL 5129297 (N.D. Ohio Dec. 10, 2010)........10

*United States v. Marzzarella,*
    614 F.3d 85, 89 (3d Cir. 2010)………………………………………..……...21

*United States v. Miller,*
    307 U.S. 174 (1939)..........................................................................passim

*United States v. Moses,*
    513 F.3d 727 (7th Cir. 2008)............................................................ 23

*United States v. Ross,*
    458 F.2d 1144 (5th Cir.1972)........................................................25, 26

*United States v. Stepp-Zafft,*
    733 F. App'x 327 (8th Cir. 2018)..................................................... 10

*United States v. Thompson/Ctr. Arms Co.,*
    504 U.S. 505 (1992).......................................................................... 34

*Yee v. City of Escondido,*
    503 U.S. 519 (1992)............................................................................ 6

**Statutes**

26 U.S.C. § 5801................................................................................passim

26 U.S.C. § 5802…………………………………………………………….23

26 U.S.C. § 5811……………………………………………......5, 23, 25

26 U.S.C. § 5812…………………………………………………….24

26 U.S.C. § 5821……………………………………………………..5, 23

26 U.S.C. § 5822…………………………………………………….24

26 U.S.C. §§ 5841..........................................................................3, 5

26 U.S.C. § 5845..............................................................................5, 23

26 U.S.C. § 5861................................................................................................passim

26 U.S.C. § 5871……………………………………………………………...3, 24

26 U.S.C. § 5872……………………………………………………...……22

**Rules**

Fed. R. App. P. 32................................................................................................38

**Other Authorities**

*A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision,*
46 Conn. L. Rev. 1463 (2014).............................................................................31


*Civil Rights: The Heller Case,*
4 NYU J.L. & Liberty 293 (2009) ............................................................passim


*Gun Law History in the United States and the Second Amendment,*
80 Law & Contemp. Probs. 55 (2017).............................................................31


*Black's Law Dictionary*
(11th ed. 2019)……………………………...…………………………………...13

# JURISDICTIONAL STATEMENT

Defendant-Appellant Jamond M. Rush's ("Rush") jurisdictional statement is complete and correct. Def. Br. at 10.[1]

---

[1]References to documents in the district court docket are designated herein as "R." followed by the appropriate number for the document (i.e. R. 1); references to defendant-appellant's brief or appendix are, respectively, to "Def. Br. __" or "Def. App. __"; references to the appendix of this brief are to "Gov. App. __"; references to documents filed in this court are designated as "7th Cir. Doc. ___";

**STATEMENT OF THE ISSUE**

I.      Whether the Supreme Court's decision in *United States v. Miller*, 307 U.S. 174 (1939), which upheld the Constitutionality of the National Firearms Act's regulation of short-barreled firearms precludes the defendant's Second Amendment challenge to his conviction for violating the National Firearms Act.

II.     If *Miller* does not preclude the defendant's Second Amendment challenge, whether a short-barreled rifle is an "arm" covered by the text of the Second Amendment as that term is interpreted in *Heller* and *Bruen*.

III.    Whether the registration and taxing scheme established in the National Firearms Act for short-barreled rifles constitutes an "infringement" as that term is used in the Second Amendment.

IV. Whether there exists an historical "twin" or an historical "analogue" for the regulation on short-barreled rifles that is contained in the National Firearms Act.

## STATEMENT OF THE CASE

A grand jury in the Southern District of Illinois charged Rush in a superseding indictment with Receipt or Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. R. 18. The charge arose from Rush's possession of an Anderson Manufacturing AR-15 rifle, having a barrel of approximately 7.5 inches – a firearm regulated by the National Firearms Act (hereinafter, "NFA"), 26 U.S.C. § 5801 *et seq.* Rush moved to dismiss the superseding indictment. R. 28. Rush argued that the statute prohibiting the possession of an unregistered short-barreled rifle is unconstitutional after the Supreme Court's 2022 decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The Government filed its response, R. 38, to which Rush filed a reply. R. 43. The district court denied Rush's motion to dismiss without a hearing. R. 46, Def. App. 46-51, *Memorandum and Order.*

After the district court denied his motion to dismiss, Rush entered a conditional guilty plea to the charge against him, reserving the right to challenge the district court's denial of his motion to dismiss. R. 52, Def. App. 52-64, *Plea Agreement.* This timely appeal followed Rush's guilty plea.

## SUMMARY OF ARGUMENT

The Supreme Court's decision in *United States v. Miller*, 307 U.S. 174 (1939) upheld the regulations in the NFA against a Second Amendment challenge. The Supreme Court's decisions in *Heller* and *Bruen* did not overrule *Miller* and *Miller* remains binding precedent on this court.

If this court decides that it is not bound by *Miller*, the defendant still cannot establish that his conviction for possessing an unregistered short-barreled rifle violates the Second Amendment. A short-barreled rifle is not an "arm" within the plain text of the Second Amendment. Furthermore, the registration and taxing scheme of the NFA does not constitute an "infringement" within the plain text of the Second Amendment. Finally, even if short-barreled rifles are "arms" within the meaning of the Second Amendment and even if the NFA's registration and taxing scheme constitutes an "infringement" within the meaning of the Second Amendment, there are historical "twins" for such regulations and there are also general historical "analogues" for the provisions in the NFA.

4

## ARGUMENTS

In 1934, Congress passed the NFA. *See* 26 U.S.C. § 5801 *et seq*. The NFA, both in its original and current iteration, requires certain firearms, including short-barreled rifles, to be registered in the National Firearms Registry and Transfer Record. *Id.* at §§ 5841, 5845(a). The NFA also establishes taxes on the making and transfer of short-barreled rifles. *Id.* §§ 5811, 5821. The Supreme Court upheld the Constitutionality of the NFA against a Second Amendment challenge in *United States v. Miller*, 307 U.S. 174 (1939). Rush stands convicted of violating 26 U.S.C. § 5861(d) for his possession of a short-barreled rifle that had not been registered to him in the National Firearms Registry.

Rush maintains that 26 U.S.C. § 5861(d) is unconstitutional post-*Bruen* because he is one of "the people" referenced in the Second Amendment and a short-barreled rifle is a "bearable arm" under the Supreme Court's *Heller* decision. Rush then argues that because those two propositions are true, the government must point to a historical tradition of regulating the conduct that § 5861(d) prohibits.   Rush maintains that the government cannot point to any historical tradition of regulating short-barreled rifles. Rush also argues that this court should disregard *Miller* on this issue because legal scholars have criticized the decision and because *Miller* involved a short-barreled

shotgun instead of a short-barreled rifle. The district court rejected these claims, and

this court should affirm.[2]

This court reviews de novo questions concerning the constitutionality of a

federal statute. *United States v. Cote*, 504 F.3d 682 (7th Cir. 2007).

### I. The Supreme Court Upheld the Constitutionality of the NFA in *United States v. Miller*, 307 U.S. 174, 178 (1939) and that Decision Remains Binding on this Court.

In 1939, the Supreme Court upheld the Constitutionality of the predecessor to 26

U.S.C. § 5861(d) against a Second Amendment challenge. *United States v. Miller*, 307 U.S.

174, 178 (1939). In *Miller*, the Supreme Court determined that the plain text of the

Second Amendment does not guarantee a right to possess a short-barreled shotgun.

*United States v. Miller*, 307 U.S. 174, 175-78 (1939); *See also Heller*, 554 U.S. at 625 (reading

*Miller* to say that the "Second Amendment does not protect those weapons not typically

possessed by law-abiding citizens for lawful purposes, such as short-barreled

shotguns.").

*Miller* forecloses this court from affording Rush the relief he seeks. *See Rodriguez*

*de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). A Courts of Appeals must

---

[2] This brief reorganizes the arguments the government made below and augments some of them with additional authority and analysis. A party can make any argument on appeal in support of their arguments presented below and are not limited to the precise arguments they made in the district court. *Yee v. City of Escondido*, 503 U.S. 519, 534–35 (1992*); United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008). (On appeal, a party may offer "a new twist" on arguments raised below based upon additional authority).

follow Supreme Court precedent that "has direct application in a case" even if that precedent "appears to rest on reasons rejected in some other line of decisions." *Id.* A court that is inferior to the Supreme Court must defer to the higher Court and grant it the sole prerogative to overrule its own decision. *Id.* Accordingly, despite Rush's implications to the contrary, *Miller* remains binding on this court.

Furthermore, the Supreme Court's more recent Second Amendment cases do not reject or even undermine *Miller.* Both *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022) and *D.C. v. Heller,* 554 U.S. 570, 625 (2008), reaffirmed *Miller*'s holding regarding the propriety of the NFA's regulation of dangerous and unusual weapons. The *Heller* Court noted, "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller,* 554 U.S. at 625. *Bruen* later endorsed *Heller's* reasoning regarding *Miller. See Bruen,* 597 U.S. at 21.[3]

Rush attempts to circumvent the *Miller* holding by arguing that: (1) the firearm at issue in *Miller* was a short-barreled shotgun, not a short-barreled rifle, and language from *Heller* and *Bruen* indicates *Miller* is no longer valid with respect to short-barreled

---

[3] In a concurring opinion in *Bruen,* Justice Alito also stressed that "[o]ur holding decides nothing about who may lawfully possess a firearm" or "the kinds of weapons that people may possess" and does not "disturb[] anything that we said in *Heller* or *McDonald. Bruen,* 597 U.S. at 72 (Alito, j., concurring).  Justice Kavanaugh also reiterated that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" and reaffirmed *Miller* and the "dangerous and unusual weapon" rule. *Id.* at 81 (Kavanaugh, J., concurring) (quoting *Heller,* 554 U.S. at 626-27).

rifles; and (2) the *Miller* opinion is flawed as evidenced by scholarly critiques of it. *Def. Br.* at 34-36. Neither argument is compelling.

Rush claims that this court should disregard *Miller* because the firearm at issue in *Miller* was a short-barreled shotgun while the gun he possessed was a short-barreled rifle. Rush supports his argument that a Supreme Court precedent on the Second Amendment should be limited to the precise types of firearms involved in the underlying case by citing a Fair Labor Standards Act civil case where the 11th Circuit observed that "regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010). Even assuming that Rush's microscopic view of Supreme Court precedent is correct, it ultimately does not advance his argument because the fountainhead cases that he is relying upon in making his current Second Amendment analysis, *Bruen* and *Heller*, involved ordinary traditional handguns and if we are going to reduce firearms cases in the Supreme Court to a mere accounting of the weapons involved, then *Bruen* and *Heller* do not apply to him. *See Heller* 554 U.S. at 574; *Bruen*, 597 U.S. at 16.

Furthermore, if this court accepts Rush's myopic view of *Miller*, (which this court should apparently apply only to *Miller* and not *Heller* and *Bruen),* then Rush argues that this court should distinguish a short-barreled rifle from a short-barreled shotgun on the ground that the former is now "in common use" and thus receives Second Amendment protection. Def. Br. at 16 n. 7, 32. Rush further argues that *Heller* and *Bruen* adopted the

"common use" standard, and that this adoption undermines the continuing validity of *Miller* as-applied to short-barreled rifles.[4] *Id,* citing *Heller,* 554 U.S. at 627; *Bruen*, 597 U.S. at 21.

The flaw in Rush's argument is that even if *Heller* and *Bruen* undermine the continuing validity of *Miller*, this court is not free to reject *Miller's* reasoning. As noted previously, only the Supreme Court can render a decision that holds that the purported "common use" standard of *Heller* and *Bruen* undermines *Miller. See Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484 (1989).

Additionally, nothing in *Bruen* points to a different conclusion than what is outlined above. As Justice Alito noted, the opinion "does not decide anything about the kinds of weapons that people may possess." *Bruen*, 597 U.S. at 72 (Alito, J., concurring). The little the opinion did say on the matter only reinforced prior precedent. The Court reiterated that the Second Amendment does not protect "dangerous and unusual weapons" and cited a passage from *Heller* that quoted *Miller* as support. *Id*. at 2143. Thus, *Bruen* is consistent with prior precedent from the Supreme Court on this issue and with circuit-court precedents addressing short-barreled rifles. On this basis, Rush's challenge must fail.

---

[4] This brief later addresses the substance of Rush's "common use" argument. The succinct reason that Rush's "common use" argument ultimately fails is because the relevant consideration under *Bruen* and *Heller* is not "common use" rather it is "common use for the particular purpose of self-defense." *See infra* at 14-24.

Further, every Circuit Court that has addressed the issue pre-*Bruen* has ruled that *Miller* applies to short-barreled rifles despite the Second Amendment. *See e.g. United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018); *See also United States v. Stepp-Zafft,* 733 F. App'x 327, 329 (8th Cir. 2018) (unpublished). *United States v. Gilbert,* 286 F. App'x 383 (9th Cir. 2008) (unpublished); *United States v. Majid*, No. 4:10CR303, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010).

Rush also argues that the *Miller* decision "has been "criticized on numerous grounds." Def. Br. at 34. He then cites two law review articles in support of that proposition. *Id* at 34-35. Whatever the merits of scholarly critiques of Supreme Court decisions, those critiques do not provide any authority for this court to ignore binding Supreme Court precedent. That is especially true where the Supreme Court emphasized in *Heller* the continuing validity of *Miller* insofar as it stands for the proposition "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller,* 554 U.S. at 625. That is especially true in this case because the Supreme Court's recent Second Amendment jurisprudence has considered and reaffirmed *Miller's* holding.

## II. If this Court is Inclined to Engage in an Advisory Analysis of the Issues in this Case based upon the *Bruen* Opinion, that Analysis Should Conclude that § 5861(d) is Constitutional Post-*Bruen.*

As demonstrated above, binding Supreme Court precedent compels this court to affirm the district court. This court recently, however, expressed a willingness to engage

10

in a more fulsome analysis of issues arising in Second Amendment cases for the sake of completeness. *Bevis v. City of Naperville, Illinois,* 85 F.4th 1175, 1197 (7th Cir. 2023). Accordingly, this brief will now address Rush's *Bruen*-based analysis.

*Bruen* now requires courts to engage in a new two-step analysis wherein courts first determine whether a challenged regulation or statute implicates the text of the Second Amendment ("Step 1") and then, if so, analyze the relevant history and tradition to decide if such a restriction is justified ("Step 2"). *Heller,* 554 U.S. at 24; Bevis, 85 F.4th at 1191. The defendant as the moving party on this issue bears the burden of proof with regard to Step 1: they must establish that the challenged regulation implicates the text of the Second Amendment. This court recognized that the defendant bears this burden in *Bevis,* 85 F.4th at 1179, when it held that "[i]n order to show a likelihood of success on the merits . . . [plaintiffs] have the burden of showing" the text covers their conduct. *Id.*at 1194. [5] If the defendant discharges his burden on Step 1, then the

---

[5] While *Bruen* does not explicitly address which party bears the burden of showing that the Second Amendment's plain text does or does not protect an individual's conduct this court correctly decided that issue in *Bevis*. *Bruen* did not explicitly decide who bears the burden on Step 1, presumably because the parties in *Bruen* did not seriously dispute that the Second Amendment "right of the people to keep and bear arms" plainly covered the law-abiding plaintiffs' right to publicly carry handguns. *Bruen,* 597 U.S. at 31-32. Ordinarily, however, a party challenging a statute's constitutionality bears the initial burden of showing that his conduct is protected. For example, in the First Amendment context, the government assumes the burden of "justify[ing] impingements on First Amendment interests" only if the claimant first "demonstrate[s] that the First Amendment even applies." *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 n.5 (1984); *see also Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) ("[W]here a plaintiff claims suppression of speech under the First Amendment, the plaintiff bears the initial burden of proving that speech was restricted by the governmental action in question." (Quotation omitted)). Given that "*Heller* repeatedly compared the right to keep and bear arms" to "the freedom of speech in the First Amendment," *Bruen*, 597 U.S. at 24,

government bears the burden of proof on Step 2: it must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms. *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("[W]hen the Second Amendment's 'plain text' covers the regulated conduct, the government has only one way to defend the regulation—by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.").

## A. Rush's Conduct is Not Covered by The Plain Text of the Second Amendment.

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. As noted previously, Rush has the burden at *Bruen's* first step to demonstrate that the Second Amendment's text covers his proposed conduct. *See supra* at 11 and n. 5.

Rush cannot show that his possession of an unregistered short-barreled rifle falls within the text of the Second Amendment because: (1) a short-barreled rifle is not an "arm" that the Second Amendment protects; and (2) the registration and taxing requirements of the NFA are not an "infringement" under the Second Amendment.

### 1. A Short-barreled Rifle is not an "Arm" that the Second Amendment Protects

---

the same burden allocation ought to apply here. Because whether a particular firearm is an "arm" and whether a particular regulation constitutes and "infringement, falls within the step-one *Bruen*'s textual inquiry, the party challenging a firearm regulation should bear the burden of showing that his conduct falls within the text of the Second Amendment.

In his brief, Rush maintains that the Second Amendment's protection extends to all "bearable arms" and that because a short-barreled rifle is a "bearable arm," the regulatory scheme in the NFA violates the Second Amendment. Def. Br. at 21. *Heller* and *Bruen* did not, however define the Second Amendment right so expansively as to include all "bearable arms." If they had, then firearms such as machine guns (which are bearable arms) would be protected and according to *Heller* they clearly are not. *Heller*, 554 U.S. at 624-25.

Rush's assertion that the Second Amendment right extends to all "bearable arms" is based on an observation in the ninth page of the *Heller* opinion where Justice Scalia observed that "the Second Amendment extends, ***prima facie*** to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. (Emphasis added). Prima facie is a Latin term that translates to "at first sight."[6] When used as an adverb, prima facie refers to a principle that it is regarded as true on first appearance but subject to additional examination or investigation. *See Black's Law Dictionary* (11th ed. 2019*), (*"**prima facie** adv. [Latin] (15c) At first sight; on first appearance but subject to further evidence or information <the agreement is prima facie valid>").

Justice Scalia made his observation that "the Second Amendment extends, ***prima facie*** to all instruments that constitute bearable arms" in Section II of the *Heller* opinion where he is explicitly evaluating the textual meaning of the Second Amendment. ("We

---

[6] https://www.law.cornell.edu/wex/prima_facie.

turn first to the meaning of the Second Amendment"). After making that initial observation, Justice Scalia then spends the next 44 pages in Section II subjecting that prima facie observation to further investigation and analysis. *See Heller*, 354 U.S. at 582-626. The conclusion of that analysis is the Court's recognition that the Second Amendment protects an individual right to possess firearms that are in *common use for self-defense*. *Id*. Because Rush fails to establish that the firearm at issue in this case—a short-barreled rifle—is in "common use for self-defense," it is not an "arm" that the Second Amendment protects, regardless of whether it is "bearable."

In *Heller*, the Supreme Court explicitly announced its holding at the end of the majority opinion. *Heller*, 554 U.S. at 635. It recognized that the texts of the Second and Fourteenth Amendments are meant to protect the right of law-abiding, responsible citizens to possess a handgun in the home ***"for the purpose of immediate self-defense."*** *Id*. (emphasis added). The Court in *Bruen* extended the *Heller* doctrine and also announced its explicit holding at the end of its majority opinion. It concluded that the Second Amendment extends to protect "***the right of a law-abiding people to carry a gun outside the home for self-defense.***" *Bruen*, 597 U.S. at 76 (emphasis added).

While all of the Supreme Court's recent cases interpreting the Second Amendment involved ordinary, traditional handguns, *See McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Heller, and Bruen,* its holdings, observations and ruminations in those cases indicate that the Second Amendment right extends to more than just

14

Colonial-era firearms. It is important to note, however, that it did so with the proviso that the firearms developed from technological advances still had to advance the Second Amendment's animating principle of self-defense. *Bruen* expressed this principle succinctly: "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. Cf. *Caetano v. Massachusetts*, 577 U.S. 411, 411–412, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) (*per curiam*) (stun guns)." *Bruen*, 597 U.S. at 28.

Both *Heller* and *Bruen* further defined the "arms" that receive Second Amendment protection. Both cases observed that "the right is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Instead those cases make plain (especially *Heller)*, that the types of arms that the Second Amendment protects is closely tied to the Founding-era concept of a "militia."

In *Heller*, the Court explained that the traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense." *Heller*, 554 U.S. at 624–25. *Heller* noted that in the Colonial and Revolutionary War-era, "small-arms weapons used by militiamen and weapons used in defense of person and home were one and the same." *Id.* The Court observed "that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface." *Id.* The Court then noted that *Miller* stands for the still-valid

15

proposition that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. *Id*. The *Heller* Court also recognized the corresponding "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. at 627 (citations omitted). The Supreme Court's has thus far only addressed three specific types of firearms in *Heller, McDonald* and *Bruen.* It has said that ordinary handguns like revolvers and pistols are protected by the Second Amendment. It has also indicated that machineguns[7] and short-barreled shotguns are not. *Heller*, 554 U.S. at 624-625.

Rush presents no support for any assertion that short-barreled rifles are in common use for self-defense. He provides commentary from a law review article and an article from Outdoor Life magazine that short-barreled rifles are "ideal" for self-defense and popular as "truck guns." *See* D.Br. at 31 and n. 20. In the court below and in his brief before this court, however he devotes his efforts to the proposition that short-barreled rifles are in "common use", not that they are in "common use for self-defense." *See* Def. Br. at 16. In support of this notion, he cites the survey from the Bureau of Alcohol, Tobacco, Firearms and Explosives: Commerce in the United States: Annual Statistical Update at 16 (2021). *Id*. at n. 7. That publication indicates there currently are 532,725 registered short-barreled rifles in the United States. There were, however,

---

[7] In its majority opinion in *Heller*, the Supreme Court characterized as "startling" any notion that machine guns are protected by the Second Amendment. *Heller*, 554 U.S. at 624.

according to the most often-cited study, 393,347,000 firearms in the United States circa
2018. https://www.smallarmssurvey.org/database/global-firearms-holdings. Even
assuming that number has not increased in the last 6 years, then registered short-
barreled rifles account for only .13% of all firearms in the United States. Thus, short-
barreled rifles are not in "common use" for anything, let alone in "common use for self-
defense."

Additionally, this court has addressed the contours of the "arms" that receive
Second Amendment protection in two recent cases. One of those case was post-*Heller*
but pre-*Bruen. Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). The other
case was decided post-*Bruen. Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (2023).

This court engaged in a very robust analysis of the two-pronged *Bruen* test,
particularly as it applies to "arms," in *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1192
(7th Cir. 2023). It came to the same conclusion outlined previously in this brief—that the
arms protected in the Second Amendment are those in common use for the purpose of
self-defense:

> Both Supreme Court decisions and historical sources indicate
> that the Arms the Second Amendment is talking about are
> weapons in common use for self-defense. That is not to say
> that there are no other lawful uses for weapons—sporting
> uses, collection, and competitions come to mind as examples.
> But the constitutional protection exists to protect the
> individual right to self-defense, and so that will be our focus.

*Id.*

This court also made an important distinction in the above passage from *Bevis* that is commonly ignored in many Second Amendment discussions—there are certain types of firearms that are merely lawful while there are other types that are not just lawful, they are Constitutionally protected. States have historically been free to allow its residents to possess a wide range of weapons for a variety of purposes. *Id*. What some commentators (along with Rush) fail to grasp, however, is the fact that citizens of a particular state or territory were (and are) allowed to possess a particular type of weapon does not provide support for their Second Amendment arguments unless there is historical evidence that the state allowed then to possess that type of firearm ***because of the Second Amendment or the preceding common law tradition.*** Here, Rush tries to argue that because there are no historical laws banning short-barreled rifles, that is historical evidence that they are protected under the Second Amendment. Rush, however, must meet his burden on this issue by showing that short-barreled rifles have not historically been regulated because there is a tradition of allowing the common use of such weapons for self-defense—i.e. that they are "arms" protected by the Second Amendment. There is no such tradition and for that reason, Rush's arguments fail simply because he has not established that short-barreled rifles are "arms" protected by the Second Amendment.

Furthermore, in *Friedman*, this court rejected Rush's "commonality" argument. *Friedman,* 784 F.3d at 409. It noted that during Prohibition, the Thompson submachine

gun was notoriously common in Chicago, but that popularity did not give it Constitutional immunity from the federal prohibition enacted in the NFA. *Id.*

This court further observed in *Friedman* that relying on how common a weapon is at the time of litigation "would be circular to boot." *Id.* The court reasoned that "machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal." *Id.* "Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it is not commonly owned. A law's existence cannot be the source of its own constitutional validity." *Id.*

*Bevis* in conjunction with *Friedman* thus make plain the defect in Rush's "commonality" argument. The fact that short-barreled weapons and machine guns may legally exist in some significant numbers in some locales having more permissive firearms regulations is not proof that those firearms are Constitutionally protected. That is because *Heller* and *Bruen* establish that there are two facets to the arms-protected-textual-analysis: protected firearms are those that are: (1) in common use; and (2) for the particular purpose of self-defense.

It is for this same reason that *Heller* and *Bruen* cannot be read as expansively as the dissent reads them in *Bevis*. In that opinion, the dissenting judge asserts that the Second Amendment right extends to "all bearable instruments that facilitate armed self-

defense." *Bevis*, 85 F.4ᵗʰ at 1208 (Brennan, J. dissenting). While there is preliminary language to this effect in *Bruen*, that the court once again characterized as "prima facie," *Bruen*, 597 U.S. at 28, that was not the ultimate conclusion in either *Bruen* or *Heller* because under a definition of protected arms that is that expansive, machine guns and short-barreled shotguns would be included in the class of protected weapons because they are bearable weapons that can conceivably facilitate self-defense. But machine guns and short-barreled shotguns clearly are not protected arms under the Second Amendment, and they were excluded from Second Amendment protection in *Heller*. *Heller*, 554 U.S. at 624.

The "common use for self-defense" rationale also explains why stun-guns receive constitutional protection. *See Caetano v. Massachusetts*, 577 U.S. 411 (2016). While stun guns, like machine guns, are a relatively new category of "arms" and their number in society is not ubiquitous, they are nevertheless protected by the Second Amendment because they are in common use as a self-defense weapon.

Additionally, there is abundant caselaw that supports the proposition that short-barreled rifles are unusual and dangerous weapons and thus the proper subject of regulation. The offense for which Rush was convicted falls under the NFA, 26 U.S.C. § 5801 *et seq.*, and these statutes govern dangerous and unusual firearms. Many courts have recognized that the *Heller* Court merely struck down a law prohibiting handgun possession, but in doing so noted that the Second Amendment "only protects the right

to own certain weapons, and it 'does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.'" *United States v. Henry*, 688 F.3d at 639-40 (9th Cir. 2012), (quoting *Heller*, 554 U.S. at 625). Other courts have noted that the firearms governed by the NFA are "dangerous and unusual weapons," and because they are not common-use weapons they have no constitutional protection. *United States v. Cox*, 906 F.3d 1170, 1184-86 (10th Cir. 2018) (recognizing under *Heller* that short-barreled shotguns and rifles, machine guns, silencers, etc., have no Second Amendment protection). *See also Bruen*, 597 U.S. at 47. (Explaining that handguns are "indisputably in 'common use' for self-defense today" and, therefore, they are protected under the Second Amendment).

More telling is *Heller*'s conclusion that short-barreled shotguns—close analogues to short-barreled rifles—belong in that category of weapons not typically possessed by law-abiding citizens for lawful purposes and, therefore, not protected by the Second Amendment. 554 U.S. at 624–25 (discussing *Miller*, 307 U.S. at 178, 59 S.Ct. 816). After *Heller*, many courts have explained that a long gun with a shortened barrel is both dangerous, because "its concealability fosters its use in illicit activity," and unusual, "because of its heightened capability to cause damage." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *see also, e.g.*, *United States v. Amos*, 501 F.3d 524, 531 (6th Cir. 2007) (McKeague, J., dissenting) ("[A] sawed-off shotgun can be concealed under a large shirt or coat. ... [T]he combination of low, somewhat indiscriminate accuracy, large

destructive power, and the ability to conceal ... makes a sawed-off shotgun useful for only violence against another person, rather than, for example, against sport game."). Though these cases dealt with short-barreled shotguns, rather than short-barreled rifles, Rush has not offered any meaningful distinction between the two.

Because the firearm at issue in this case—a short-barreled rifle--is not one that is commonly possessed by law-abiding citizens for self-defense, it is not an "arm" that *Heller* and *Bruen* recognized as deserving of Second Amendment protection.

### 2. Laws Requiring Registration of Short-Barreled Weapons do not "Infringe" on Second Amendment Rights.

Even assuming a short-barreled rifle is an "arm" protected under the Second Amendment, it does not follow that the regulatory scheme enacted under the NFA violates the text of the Second Amendment. The NFA does not implement a ban on an individual's possession of a short-barreled rifle. It merely establishes a registration and taxing scheme.

Section 5861(d) is part of the NFA. 26 U.S.C. §§ 5801–5872. The NFA does not forbid possession of short-barreled rifles thus it does not "infringe" on any right as that term is used in the Second Amendment. In fact, as noted in Rush's brief, according to the 2021 Bureau of Alcohol, Tobacco, Firearms and Explosives 2021 statistical report, there are 532,725 registered short-barreled rifles in the United States. Section. Def. Br. at 31 and n. 21. Thus, 5861(d) does not infringe on anyone's ability to possess a short-

barreled rifle, it simply requires that any short-barreled rifle that a person possesses to have been previously registered.

The Act also requires a transferee to pay a tax upon transfer. Among other enumerated powers, Article I of the Constitution gives Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States," *id.* cl. 1, and "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Power [ ]," *id.* cl. 18.

Accordingly, this court has observed that although "a violation of § 5861(d) necessarily involves the possession of a firearm, the crime is more aptly characterized "as a form of tax evasion." *United States v. Moses*, 513 F.3d 727, 732 (7th Cir. 2008). *See also United States v. Lim*, 444 F.3d 910, 913 (7th Cir. 2006); *United States v. Cox*, 906 F.3d 1170, 1179–80 (10th Cir. 2018). The statute collects various taxes from businesses and transactions involving listed firearms—which include short-barreled rifles and shotguns, silencers, and destructive devices. *See* 26 U.S.C. § 5845(a) (defining "firearm"). Importers, manufacturers, and dealers of these firearms must pay a yearly tax of $500 to $1,000. *Id.* § 5801. And each time one of these firearms is made or transferred, the statute levies a $200 tax. *Id.* § 5811 ("Transfer tax"); *id.* § 5821 ("Making tax"). To carry out the taxing scheme, it also mandates the registration of every importer, manufacturer, and dealer of the covered firearms, *see id.* § 5802, and of every

firearm made, *see id.* § 5822, or transferred, *see id.* § 5812. To ensure compliance, the NFA provides that the failure to abide by any of its rules is a crime punishable by up to ten years in prison (or a fine, or both). *Id.* §§ 5861 ("Prohibited acts"), 5871 ("Penalties").

Rush argues in his brief that the "Constitution prohibits the government from imposing even de minimis burdens on fundamental rights." *See* Def. Br. at 33. Once again, his argument faces the obstacle of direct Supreme Court precedent precluding him relief. The Supreme Court addressed Congress's taxing-clause authority to enact the NFA eighty-one years ago, when a firearms dealer was indicted for failing to pay the (then $200) annual dealer tax challenged the statute's constitutional basis. *See Sonzinsky v. United States*, 300 U.S. 506, 511 (1937). The gun-dealer in *Sonzinsky* conceded that the taxing power allowed Congress to tax firearms dealers, yet he "insist[ed]" that the tax at issue was "not a true tax, but a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms." *Id.* at 512. Sonzinsky argued that the NFA revealed its "penal and prohibitive character" by cumulatively taxing importers, manufacturers, dealers, and transferors. *Id.*

The Supreme Court rejected the dealer's challenge, refusing to conclude that the NFA—on its face a taxing measure—exceeded congressional power "by virtue of its deterrent effect on the activities taxed." *Id.* at 513–14. "Every tax is in some measure regulatory," explained the Court, and "a tax is not any the less a tax because it has a regulatory effect." *Id.* at 513. Unlike the child-labor tax struck down in the *Child Labor*

*Tax Case*, the NFA tax wasn't "a penalty resorted to as a means of enforcing [other] regulations." *Id.* (citing *Bailey v. Drexel Furniture Co. (The Child Labor Tax Case)*, 259 U.S. 20, 35 (1922). Rather, though the NFA contained registration provisions, those provisions were "obviously supportable as in aid of a revenue purpose." *Id.* And because the $200-per-year dealer tax produced "some revenue," the Court refused to ponder Congress's motives in imposing it or to estimate its regulatory effect. *Id.* at 514. The Court then concluded that since the NFA [wa]s not attended by an offensive regulation, and since it operate[d] as a tax," the NFA's taxing scheme was "within the national taxing power." *Id. See also United States v. Cox*, 906 F.3d 1170, 1179–80 (10th Cir. 2018).

This court reached a similar conclusion in *United States v. Lim*, 444 F.3d 910, 913 (7th Cir. 2006). Like Rush, Lim contended that section 5861(d) exceeds Congress's taxing power because the purpose of the statute is not to tax, but instead to prohibit the possession of certain firearms. This court rejected that argument, holding that, when taken in context with the rest of the statute, section 5861(d) reasonably may be construed as "part of the web of regulation aiding enforcement of the transfer tax provision in section 5811," citing *United States v. Ross,* 458 F.2d 1144, 1145 (5th Cir.1972). This court noted that Congress may legitimately target for punishment the recipient of an unregistered firearm as a means of facilitating the collection of the transfer tax: "Having required payment of a transfer tax and registration as an aid in collection of

that tax, Congress under the taxing power may reasonably impose a penalty on possession of an unregistered firearm." *Id.*, citing *United States v. Gresham,* 118 F.3d 258, 262 (5th Cir.1997) (quoting *Ross* at 1145). This court further noted that "[a]lthough the transferee is not responsible for registering the firearm (and indeed cannot do so), the Act imposes on him 'an affirmative duty to ensure that the weapon is properly registered before taking possession of it'." *Id,* citing *United States v. Khatib,* 706 F.2d 213, 216 (7th Cir.1983); *see also United States v. Freed,* 401 U.S. 601 (1971); *United States v. Brown,* 548 F.2d 204, 209 (7th Cir.1977). This court also observed that unregistered firearms are as likely (if not more likely) to come to the attention of law enforcement in the hands of the transferee. Thus, attaching criminal consequences to the possession of an unregistered weapon is a rational way of discouraging the making or transfer of untaxed firearms. Section 5861(d) in this way encourages registration and reinforces the revenue-generating purpose of the Act. Thus, it is a constitutional exercise of Congress's taxing power.

Furthermore, the requirement of registering a short-barreled rifle is similar and analogous to other measures the Supreme Court has approved. In *Bruen*, the Court approved such regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id.* at 2138 n. 9 ("Nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes"[.]).

In doing so, the Court had no need to analyze the history of shall-issue licensing regimes. This is because these licensing regulations do not prevent law-abiding, responsible citizens from exercising their Second Amendment right. *Id*. (citation omitted). The same is true here; § 5861(d) does not prevent law-abiding, responsible citizens from exercising their legal (although not Constitutional) right to possess a short-barreled rifle. The NFA simply requires them to register the weapon made, received, or possessed and pay the accompanying tax. This is no different than other prerequisites, such as a background check or completion of a firearms safety course. In other words, the requirement to register an NFA firearm is just a condition of possession that does not constitute an infringement of the Second Amendment as a textual matter.

### B. Even if Short-Barreled Weapons are "Arms" and even if the NFA's Regulatory Scheme Constitutes an "Infringement," there is a Historical Tradition Supporting the Regulation of Short-Barreled Weapons.

If this court concludes that the *Miller* precedent does not foreclose Rush's argument, and if it rejects the government's plain text arguments presented above, then it must reach Step 2 of the *Bruen* analysis. According to *Bruen,* whether a modern firearm regulation (like the NFA) passes muster under the Second Amendment depends on whether the government can identify a relevant historical analogue for the regulation in question. *Bruen,* 597 U.S. at 29-30. *Bruen* further provides that whether modern and historical regulations impose a comparable burden on the right of armed

self-defense and whether that burden is comparably justified are "*central*" considerations when engaging in an analogical inquiry. (Emphasis original), citing *McDonald*, 561 U.S. at 767, (quoting *Heller*, 554 U.S. at 599). *Bruen* further described the required analogical reasoning under the Second Amendment as neither a regulatory straitjacket nor a regulatory blank check. *Id.* Courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Id.* citing *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021). The *Bruen* Court further explained that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.*" *Id.* So even if a modern-day regulation is not "a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

In the case of the NFA, there exits not only historical analogues for the NFA, but there are also historical "twins" and "dead ringers" for the barrel-length restrictions in the NFA.

### 1. There are Colonial Era and Revolutionary War Era Laws Regulating the Barrell Length of Firearms for Militia Members that Constitute Historical "Twins" to the NFA.

As noted elsewhere in this brief, and discussed in more detail than will be repeated here, *see* supra at 15-16, the types of arms that the Second Amendment protects is closely tied to the Founding-era concept of the "militia." Thus if there is a specific

historical analogue where there are laws regulating the barrel-length of the firearms that militia members were directed to keep, that would provide a historical "twin" as referenced in *Bruen*. There are such historical laws, and the Supreme Court referenced them in *Miller*. It noted that in the Colonial-era:

> Also 'Clauses intended to insure the possession of arms and ammunition by all who were subject to military service appear in all the important enactments concerning military affairs. Fines were the penalty for delinquency, whether of towns or individuals. According to the usage of the times, the infantry of Massachusetts consisted of pikemen and musketeers. The law, as enacted in 1649 and thereafter, provided that each of the former should be armed with a pike, corselet, head-piece, sword, and knapsack. ***The musketeer should carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length,*** a priming wire, scourer, and mould, a sword, rest, bandoleers, one pound of powder, twenty bullets, and two fathoms of match. The law also required that two-thirds of each company should be musketeers. (Emphasis added).

*United States v. Miller*, 307 U.S. at 180.

The *Miller* Court also cited a Revolutionary Era law that regulated the length of firearms for militia members:

> The General Assembly of Virginia, October, 1785 (12 Hening's Statutes c. 1, p. 9 et seq.), declared: 'The defense and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty.' It further provided for organization and control of the Militia and directed that 'All free male persons between the ages of eighteen and fifty years,' with certain exceptions, 'shall be inrolled or formed into companies.' 'There shall be a private muster of every company once in two months.'

Also that 'Every officer and soldier shall appear at his respective muster-field on the day appointed, by eleven o'clock in the forenoon, armed, equipped, and accoutred, as follows: * * * *every non-commissioned officer and private with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel*, with a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, to contain and secure twenty cartridges fitted to his musket, a good knapsack and canteen, and moreover, each non-commissioned officer and private shall have at every muster one pound of good powder, and four pounds of lead, including twenty blind cartridges; and each serjeant shall have a pair of moulds fit to cast balls for their respective companies, to be purchased by the commanding officer out of the monies arising on delinquencies. Provided, That the militia of the counties westward of the Blue Ridge, and the counties below adjoining thereto, shall not be obliged to be armed with muskets, but may have good rifles with proper accoutrements, in lieu thereof. And every of the said officers, non-commissioned officers, and privates, shall constantly keep the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for by his commanding officer. If any private shall make it appear to the satisfaction of    the court hereafter to be appointed for trying delinquencies under this act that he is so poor that he cannot purchase the arms herein required, such court shall cause them to be purchased out of the money arising from delinquents.' (Emphasis added).

*Id.* at 181–82.

Because there are historical "twins" for the barrel-length restrictions contained in the NFA, this court should conclude its *Bruen* historical analysis with reference to those "twins." There are also general historical analogues that lend further support to the Constitutional validity of the NFA and, in the interest of completeness, this brief will now address those.

30

### 2. There are Historical Analogues to the Regulations in the NFA

As a general, overriding concept, any notion that there has not been a historical regulation of firearms until the modern era is simply false. Colonial governments substantially regulated the firearms trade. *Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). Many of the colonies enacted laws regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms. For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals…A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'… In the 1800s, three Southern states imposed taxes on personally held firearms." Robert Spitzer, *Gun Law History in the United States and the Second Amendment*, 80 Law & Contemp. Probs. 55, 76 (2017); *see also* Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision*, 46 Conn. L. Rev. 1463, 1483 (2014) ("The Founders would likely challenge the notion that the government could not register weaponry or prohibit gun ownership. Unlike modern Americans, the founding generation endured mandatory gun registration as a basis for ensuring a functional militia, and routinely disarmed those considered threatening to the establishment of social order."); *Minutes from a Convention of the Federalist Society: Civil Rights: The Heller Case*, 4 NYU J.L. & Liberty 293, 309 (2009) ("The Founders did have gun control. They

had mandatory musters. Everyone with a gun had to show up and register their firearm…").

Similarly, in the early 17th century, Connecticut banned residences from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia likewise provided that people were at "liberty to sell arms and ammunition to any of his majesties loyal subjects *inhabiting this colony*." *Id.* at 685 n. 18 (emphasis added). Still other colonies "controlled the conditions of trade" in firearms. *Id.* at 685.

Further, States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *See supra*, Spitzer article at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and appointed a state inspector "to oversee or conduct the testing." *Id.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id.*

Exploring deeper into historical sources under the second prong of the *Bruen* test, it is clear that the regulation regarding the receipt and transfer of some firearms is permissible and consistent with long-standing firearm regulations going back to even before the Founding Era. Pre-colonial evidence suggests that colonies implemented forms of gun registration in a variety of ways. *Herrera v. Raoul,* 670 F. Supp. 3d 665, 677 (N.D. Ill. 2023). In 1631, Virginia implemented a "muster" requirement, necessitating

inhabitants to annually account for their "arms and ammunition" to the "commanders" under which they served. *Id.* Other American colonies in the 17th century had firearm owners register their guns through similar mandatory "muster" laws, taxes requiring identification of firearms, and as part of broader legislative programs regarding the sale, transfer, and taxation of firearms. *Id. See also United States v. Holton*, 639 F.Supp.3d 704, 711-12 (N.D. Tex. Nov. 3, 2022) (noting that multiple colonial governments required registration of arms through mandatory "muster" laws and taxes imposed from "as early as 1607 and well into the 1800s").

Furthermore, during the Reconstruction Era, which is also a relevant time-period under *Bruen* and *Heller,* many state legislatures taxed firearms, which in essence required that firearms be identified and disclosed to the government. *Herrera*, 670 F. Supp. 3d at 678. Mississippi required a "tax of two dollars on each dueling or pocket pistol" in 1848. *Id.* In 1856, North Carolina similarly required that "every pistol, except such as are used exclusively for mustering" that was "used, worn or carried" be taxed. *Id.* Georgia, in 1866, enacted a similar tax, requiring "one dollar apiece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation in the counties," with the firearm owner required to render an "oath" of any such "gun, pistol, musket, or rifle." *Id.* Alabama did much the same a year later. *Id.* The state imposed a "tax of two dollars each" for "[a]ll pistols or revolvers in the possession of private

persons," for which the taxpayer would receive "a special receipt" in order to prove payment.  *Id.*

Accordingly, historical sources demonstrate an array of laws from before the Founding Era until the present day which required firearm "registration," and imposed taxes and other restrictions on their possession and transfer. These are historical analogues to the current registration and taxation requirement attending short-barreled rifles.

Furthermore, there are even more specific historical analogues based on the status of NFA weapons as "unusual" and "dangerous" firearms. The rationale behind the enactment of the NFA was to address the problem of unusual, dangerous, concealable firearms that are useful to criminals. "It is of course clear from the face of the Act that the [NFA]'s object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); *See also Haynes v. United States*, 390 U.S. 85 (1968). Beyond the general registration and taxing regulations noted above, there is also a corresponding historical tradition of regulating dangerous and unusual weapons. *See also supra* at 22-23.

At the time of the Second Amendment's ratification, and during the time of the ratification of the Fourteenth Amendment, regulation of dangerous and unusual

weapons was well-accepted. *See Bruen*, 597 U.S. at 59 ("The historical evidence from antebellum American" shows that "States could lawfully eliminate one kind of public carry-concealed carry-so long as they left open the option to carry openly); *Robertson v. Baldwin* 165 U.S. 275, 281-82 (1897) (stating in *dicta* that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons"). Thus, short-barreled rifles, like short-barreled shotguns, may be regulated because they are dangerous and unusual, concealable weapons.

Further, under English Common Law, "the offence of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 William Blackstone Commentaries *148; *See* 1 William Howkins, Please of the Crown, 135 (1716) ("[T]here may be an Affray where there is no actual Violence, as where a Man arms himself with dangerous and unusual Weapons, in such a matter as will naturally cause Terror to the People."). Following that course, courts have long acknowledged that a person commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people." *State v. Langford*, 3 Hawks 381, 383 (N.C. 1824).

There exist specific historical twins to the NFA's regulation of the barrel length of permitted firearms. There is also a historical tradition of requiring the registration and taxation of firearms in general. There is also a historical tradition of regulating and

outright banning dangerous and unusual, concealable weapons. Accordingly, Rush's claims cannot survive the Step 2 *Bruen* analysis.

## III. CONCLUSION

This court should affirm the district court's denial of Rush's Motion to Dismiss Indictmet. The Supreme Court's decision in *United States v. Miller*, 307 U.S. 174 (1939) upheld the regulations in the NFA against a Second Amendment challenge. The Supreme Court's decisions in *Heller* and *Bruen* did not overrule *Miller* and *Miller* remains binding precedent on this court.

Furthermore, if this court decides that it is not bound by *Miller*, the defendant still cannot establish that his conviction for possessing an unregistered short-barreled rifle violates the Second Amendment. A short-barreled rifle is not an "arm" within the plain text of the Second Amendment. Furthermore, the registration and taxing scheme of the NFA does not constitute an "infringement" within the plain text of the Second Amendment. Finally, even if short-barreled rifles are "arms" within the meaning of the Second Amendment and even if the NFAs registration and taxing scheme constitutes an "infringement" within the meaning of the Second Amendment, there are historical "twins" for such regulations and there are also general historical "analogues" for the

provisions in the NFA.

**Respectfully submitted,**

**THE UNITED STATES OF AMERICA**

**RACHELLE AUD CROWE**
**United States Attorney**

**s/ Thomas E. Leggans**
**THOMAS E. LEGGANS**
**AUSA**
**Office of the United States Attorney**
**402 West Main Street – Suite 2A**
**Benton, Illinois 62821**
**(618) 439-3808**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i), as modified by Circuit Rule 32(c), because this brief contains 9,027 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Seventh Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared using Microsoft Word 2016, in 12-point Book Antiqua font, a proportionally spaced typeface.

Respectfully Submitted,

RACHELLE AUD CROWE
United States Attorney

**/s/   Thomas E. Leggans**
THOMAS E. LEGGANS
Assistant United States Attorney
402 West Main Street – Suite 2A
Benton, Illinois 62812
(618) 439-3808

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **COURT OF APPEALS** |
| | ) | **NO. 23-3256** |
| Plaintiff-Appellee, | ) | |
| | ) | **Southern District of Illinois** |
| vs. | ) | **District Court No. 22-CR-40008-JPG-1** |
| | ) | |
| JAMOND M. RUSH, | ) | **The Honorable J. Phil Gilbert,** |
| | ) | **District Judge** |
| Defendant-Appellant. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing and by placing said copy in a postpaid envelope addressed to the following:

s/ **Thomas E. Leggans**
THOMAS E. LEGGANS