IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

No. 23-3256
_____

UNITED STATES OF AMERICA,

                                        Plaintiff – Appellee

v.

JAMOND M. RUSH,

                                        Defendant – Appellant

_____

On Appeal from the
United States District Court
for the Southern District of Illinois
Cause No. 4:22-cr-40008-JPG-1
The Honorable J. Phil Gilbert

---

REPLY BRIEF OF THE APPELLANT

---

**NEWTON BARTH, L.L.P.**

By:   s/ Talmage E. Newton IV
       Talmage E. Newton IV, ARDC6305302
       Steven S. Hoffmann, 74445 MO
       555 Washington Ave., Ste. 420
       St. Louis, Missouri 63101
       Telephone:  (314) 272-4490
       tnewton@newtonbarth.com
       steven@newtonbarth.com
       ***ATTORNEYS FOR APPELLANT***

1

## **TABLE OF CONTENTS**

TABLE OF CONTENTS …………………………………………….………2

TABLE OF AUTHORITIES …………………………………………….………3

ARGUMENT ……………………………………………………..………..5

CONCLUSION ……………………………………………………….......15

CERTIFICATE OF COMPLIANCE …………………………………………..16

PROOF OF SERVICE …………………………………………………...…17

# TABLE OF AUTHORITIES

**Cases**

*Atkinson v. Garland*, 70 F.4th 1018, 1019 (7th Cir. 2023) ................................... 5, 6

*D.C. v. Heller*, 554 U.S. 570 (2008) ............................................................ 5, 6, 7, 9

*Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015) ............. 9

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) ................................. 5, 6, 9

*United States v. Miller*, 307 U.S. 174 (1939) ................................................ passim

**Statutes**

26 U.S.C. §5841(a) ................................................................................................ 11

26 U.S.C. §5861(d) ..................................................................................... 5, 10, 15

26 U.S.C. § 5849 ...................................................................................... 8, 10, 11, 14

**Other Authorities**

1911 N.Y. Laws 444-45, ch. 195, § 2 .................................................................... 11

1913 Mich. Pub. Acts 472, § 1 ............................................................................... 11

1917 Cal. Sess. Laws 221-225 ............................................................................... 11

1917 Or. Sess. Laws 804-808 ................................................................................ 11

1931 Ill. Laws 453 ................................................................................................. 11

1933 Haw. Sess. Laws 36-37 ................................................................................. 12

1933 Wyo. Sess. Laws 117 .................................................................................... 11

1934 Va. Acts 137-39 ...............................................................................................12

James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 HARV. J.L & PUB. POL'Y, 493, 496, n.7 (2017) ........................ 10, 13

Russell W. Galloway, Means-End Scrutiny in American Constitutional Law, 21 Loy. L.A. L. Rev. 449 (1988) ................................................................................8

S.D. Sess. Laws 245-47 ...........................................................................................12

Wis. Sess. Laws 245-47 ...........................................................................................12

## Regulations

27 C.F.R. § 479.103 .................................................................................................11

## Constitutional Provisions

U.S. Const. amend 2................................................................................... passim

## ARGUMENT

### I.     This Court is Obligated to Apply *Bruen*'s Test, Not *Miller*'s Test.

*Bruen* requires that Courts apply a "new framework for analyzing restrictions on the possession of firearms" *Atkinson v. Garland*, 70 F.4th 1018, 1019 (7th Cir. 2023). The restrictions found at issue here—26 U.S.C. §5861(d)—were enacted without the benefit of the Supreme Court's decisions in *D.C. v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The government asks this Court to analyze the constitutionality of the challenged regulation under the pre-*Bruen* analysis. In fact, the government would seem to prefer that this Court look only to the Supreme Court's precedents as they stood in 1939, a time when "the Second amendment applie[d] only to the Federal Government," and where an individual right protected by the Second Amendment was assigned a "second-class" status. *McDonald,* 561 U.S. at 758-780. They insist that *United States v. Miller*, 307 U.S. 174 (1939) short-circuits the *Bruen* analysis, claiming that case upheld the regulation of "short-barreled firearms," when in fact its limited holding applied to short-barreled shotguns. The reality is that *Miller*'s holding regarding short-barreled shotguns is also open to challenge under *Bruen*, and in that hypothetical case, the government would also have to "affirmatively prov[e] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and

bear arms." *Atkinson*, 70 F.4th at 1019. The burden here is the same; there is no other test. The test that *Miller* and countless other precedential cases employed has been set aside.

The government calls this view "myopic," as it attempts to wave away the necessity of employing the test. They ask this Court to blur the distinction between a shotgun and a rifle. But the distinction matters very much. Rush was not charged with possessing a machine gun nor a short-barreled or sawed-off shotgun, and there is no allegation that he ever possessed any of those devices. Nevertheless, the government's brief mentions machine guns ten times, and short-barreled or sawed-off shotguns nineteen times. *Heller*, *McDonald* and *Bruen* made it clear that the possession of handguns is protected conduct. *Heller* implied in dicta that restrictions on machineguns are lawful. *Heller*, 554 U.S. at 624. *Bruen* limited itself to discussing handguns; it never mentioned rifles, shotguns, or machineguns, but its test applies to every form of bearable arm, including arms disfavored in the nineteenth and twentieth centuries.

*Bruen*'s text and tradition analysis instructs courts to scrutinize the text of the Second Amendment and the traditions of the founding generation, not the judicial texts and legislative acts of the twentieth century. *Heller*'s reading of *Miller* posited at the time that the Second Amendment did not protect short-barreled shotguns, because the Amendment "does not protect those weapons not typically possessed by

law-abiding citizens for lawful purposes" *Heller*, 554 U.S. at 2816, explaining that "the sorts of weapons protected were those 'in common use at the time[]', and identifying a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' *Id*. at 2817 (quoting *Miller*, 307 U.S. at 179).

*Miller* may have necessarily found that short-barreled shotguns were not in common use "at the time"—presumably meaning at the time the Second Amendment was ratified—and the same would very likely hold for machineguns, but the conclusion is not so clearly applied to short-barreled rifles. *Bruen* chose to repeat *Miller*'s "in common use" language, and expanded its reasoning to encompass weapons "in common use *today*." *Bruen*, 597 U.S. 1 at 2143. (emphasis added). *Bruen* approved of the public carry of handguns *because* they are in common use today, just as *Miller* disapproved of the possession of short-barreled shotguns because they were *not* in common use in Colonial America. In contrast, Rush has affirmatively demonstrated that other short-barreled arms, such as blunderbusses and rifles, were common during *both* the founding era and now. (Appellant's Br. at pp. 29-32). The government attempts to shift the burden to Rush to show that those arms were and are in "common use for self-defense." (Govt's Br. at p. 16). It is plainly the government's burden to show that such arms were *not* in common use for self-defense. They have not done so. Relatedly, they have not shown that Rush possessed the Anderson Manufacturing AR-15 rifle for any purpose *other* than self-defense.

7

The government's position is that *Miller* forecloses any review of the constitutionality of provisions of the National Firearms Act of 1934. This is not the case. *Miller*'s test did incorporate historical analysis, but it did not employ *Bruen*'s test. In considering whether *Miller* constrains this Court's ability to conduct an appellate review, rendering it merely an "advisory analysis," as the government states, this Court should first look directly to the holding of *Miller*:

> In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.

*Miller*, 307 U.S. at 178. Asking whether there is a "reasonable relationship" between the possession of a short-barreled shotgun and the "preservation or efficiency of a well regulated militia", *Miller* engaged in the classic form of "means-end scrutiny": the rational basis test.[1] The holding of *Bruen* clearly abrogates *all* means-end frameworks for analyzing Second Amendment challenges:

---

[1] See Russell W. Galloway, *Means-End Scrutiny in American Constitutional Law*, 21 Loy. L.A. L. Rev. 449 (1988). Available at:
https://digitalcommons.lmu.edu/llr/vol21/iss2/1 (last accessed 4/18/24). ("Means-end scrutiny is an analytical process involving examination of the purposes (ends) which conduct is designed to serve and the methods (means) chosen to further those purposes. When government action is subject to a constitutional limit, courts frequently evaluate the justification for that action. If a sufficient justification exists, the action may be permitted despite the applicability of the limit. If

8

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command . . . *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

*Bruen*, 597 U.S. at 17-19. In announcing a new Second Amendment test, *Bruen* reaches beyond the New York law at issue in that case: it abrogates all Second Amendment precedents which employed means-end scrutiny, and instructs the courts below to employ the new test. Nevertheless, the government also directs this Court to uphold Mr. Rush's conviction because of the holding in *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015). *Friedman*—another pre-*Bruen* case—incorporated *Miller*'s holding: "we think it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' . . . and whether law-abiding citizens retain adequate means of

---

the courts find the justification insufficient, they hold that the action violates the limit and is unconstitutional.").

9

self-defense. *Id*. at 10. (internal citations omitted). That is not the test that *Bruen* demands, it is means-end scrutiny.

## II. The Government Has Not Shown that Short-Barreled Rifles Are Dangerous and Unusual.

The government has also argued that short-barreled rifles are "dangerous and unusual" (Govt's Br. at 20), arguing that the statute under which Rush was convicted are grouped with the statutes that "govern dangerous and unusual firearms." *Id*. The argument is circular. Although the NFA claims to regulate only a subset of purportedly more dangerous weapons, the firearms regulated by the NFA, particularly short-barreled rifles, "have no discernable operational differences from firearms excluded from the Act," such as pistols and other handguns.[2] Short-barreled rifles are no more dangerous than these other firearms.

## III. The 'Registration and Taxing' Scheme of the NFA is a Firearm Regulation, Subject to *Bruen*'s Test.

The 'registration and taxing' scheme of the NFA is a firearm regulation. Just as the New York law in *Bruen* required law-abiding, responsible citizens to 'demonstrate a special need for self protection distinguishable from that of the general community' in order to carry arms in public", *Bruen*, 597 U.S. at 70, the NFA's regulation at 26 U.S.C. §5861(d) requires law-abiding, responsible citizens

---

[2] James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 HARV. J.L & PUB. POL'Y, 493, 496, n.7 (2017).

10

to pay a transfer tax and register the firearm, as a prerequisite to possessing or carrying the arms for self-defense. To register a firearm, a person must file a notice "set[ting] forth the name and address of the manufacturer, . . . the date of manufacture, the type, model, length of barrel, overall length, caliber, gauge or size, serial numbers, and other marks of identification." 27 C.F.R. § 479.103; see also 26 U.S.C. § 5841(a). Just as the regulation in *Bruen*, the NFA is directed at a "general societal problem" that has existed since the founding: to discourage the proliferation of firearms used in crimes. *Bruen*, 597 U.S. at 26-7. Therefore, the government must identify a "well-established and representative" tradition of "distinctly similar" historical regulations mirroring the provisions of the NFA charged here. *Id*. at 26, 30.

Until the early 1900s, there were no requirements to register firearms with the federal or state government. By the time of the enactment of the NFA in 1934, only 11 states had passed registration statutes, with the first taking effect in 1911.[3] These

---

[3] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2; 1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1; 1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person § 7; 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 5; 1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4; 1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the

laws post-date the enactment of the Second Amendment by 120 years. According to *Bruen*, such recent evidence is irrelevant to the Second Amendment analysis unless it "confirm[s]" what earlier sources have already established, which is not the case here. *Bruen*, 597 U.S. at 37. The government cannot identify any earlier sources demonstrating a historical tradition of requiring registration of firearms. Indeed, the Court in *Bruen* declined even to "address any of the 20th-century historical evidence brought to bear by respondents" because it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 66 n.28. The same is true of the registration statutes cited above; they provide no evidence § 5861(d)'s registration requirement is consistent with the nation's historical tradition of firearm regulation dating back to the enactment of the Second Amendment. *See id*. at 36 (requiring evidence that a "governmental practice has been open, widespread, and unchallenged since the early days of the Republic").

Moreover, the registration statutes identified herein are at most "outliers."

---

Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4; 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8; 1931-1933 Wis. Sess. Laws 245-47, An Act . . . Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06; 1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3; 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

*Id.* at 65. Where only 11 of the then-48 states passed registration statutes by the mid-20th century, it is insufficient to show "a tradition" of such firearm regulation. *Id.* at 46. ("doubting" that statutes from three of the original 13 colonies, equaling 23 percent, "could suffice to show a tradition" of firearm regulation). These isolated and post-dated registration statutes are therefore not "representative" in the way *Bruen* demands. *Id.* at 30.

Finally, the early 1900s registration statutes were not directed to the type of firearms regulated here. Even though short-barreled firearms existed and were in widespread use at and shortly after the time of the Second Amendment's ratification,[4] it does not appear any locality required their registration. None of the regulations identified herein specifically required registration of short-barreled rifles. Although short-barreled rifles were available and in use in the early stages of our nation's history, there is no evidence of a historical tradition requiring their registrations. Therefore, the application of § 5861(d) by punishing Rush for failing to register a short-barreled rifle is inconsistent with his protections under the Second Amendment.

---

[4] D'Cruz, supra, at 508. ("Short-barrel firearms, unlike modern 'assault weapons,' did exist at the time of the Second Amendment's drafting and ratification."). Various versions of the blunderbuss, firearms "boasting very short barrels, were popular for self-defense and occasionally used by militaries." *Id.* at 503.

IV. **The Government Has Failed to Produce a Historical Regulation that Imposes a 'Comparable Burden' on the Right to Armed Self-Defense that is 'Comparably Justified.'**

As a last resort, the government suggests that Colonial era and Revolutionary War era laws regulating the barrel length of firearms for militia members are "historical twins". (Govt's Br. p. 28). The first historical regulation suggested by the government required members of the infantry of Massachusetts to "carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length." (*Id*. at p. 29). As an initial point, it's not obvious whether the Massachusetts regulation addresses total musket length or barrel length. The government has not explained what "bastard musket bore" means, or how it would be relevant to the regulation in the NFA at issue here. Nevertheless, the regulation is not relevant to the historical analysis: it is neither a comparable burden, nor comparably justified: the Massachusetts regulation attempts to provide uniformity amongst musketeers in the infantry, regulating the length of muskets carried for a military purposes, and says nothing about prohibiting or taxing the firearms that Massachusetts residents possessed for self-defense. But evidence of this historical regulation also cuts in favor of Rush: if short muskets (or short-barreled muskets) were common enough that Massachusetts had to instruct infantry members to leave them at home when the militia mustered, then they were common enough that were exactly the kind of arms that were in common use at the time,

possessed for lawful purposes. The analysis is exactly the same for the Virginia regulation, which required officers and soldiers of the militia to appear at a muster with a "good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel." (*Id*. at p. 29-30). The regulation says nothing about the kinds of arms that ordinary people would have kept for self-defense, it only imposes a requirement on officers and soldiers of the militia, and is therefore inapposite.

## Conclusion

The government has not proven a historical tradition justifying the prohibition of short-barreled rifles. They are not dangerous and unusual, and they are entitled to the full protection of the Second Amendment, and therefore cannot be criminalized absent the government's demonstration of a robust historical tradition of such regulation. They have not done so. Application of 26 U.S.C. §5861(d) violates Rush's Second Amendment rights to possess firearms for self-defense. For these reasons, this Court should reverse Rush's conviction below.

**Respectfully Submitted,**
**NEWTON BARTH, L.L.P.**

By:   /s/ *Talmage E. Newton IV*
Talmage E. Newton IV, ARDC6305302
Steven S. Hoffmann, 74445 MO
555 Washington Ave., Ste. 420
St. Louis, Missouri 63101
Telephone: (314) 272-4490
tnewton@newtonbarth.com
steven@newtonbarth.com
***ATTORNEYS FOR APPELLANT***

# **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(ii) (reply brief), as modified by Circuit Rule 32(c), because this brief contains 2836 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared using Microsoft Word 2024, in a proportionally spaced typeface, 14-point Times New Roman.

/s/ *Talmage E. Newton IV*
Talmage E. Newton IV, ARDC6305302

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 23, 2024, Appellant's Reply was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

/s/ *Talmage E. Newton IV*
Talmage E. Newton IV, ARDC6305302
